2017 PA Super 87

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JACOB ALLEN YOCKEY, | |
| Appellant | No. 107 WDA 2016 |

Appeal from the Judgment of Sentence of October 21, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0012979-2014

BEFORE:  BOWES, OLSON and STRASSBURGER,* JJ.

OPINION BY OLSON, J.:                                    **FILED APRIL 04, 2017**

Appellant, Jacob Allen Yockey, appeals from the judgment of sentence entered on October 21, 2015, as made final by the denial of Appellant's post-sentence motion on December 17, 2015.  We affirm.

The Commonwealth charged Appellant with involuntary deviate sexual intercourse ("IDSI"), unlawful contact with a minor, corruption of minors, and two counts of indecent assault;[1] the charges arose out of Appellant's repeated sexual abuse of a minor male victim (herein identified as "the

---

[1] 18 Pa.C.S.A. §§ 3123(a)(7), 6318(a)(1), 6301(a)(1)(ii), 3126(a)(2), and 3126(a)(8), respectively.

*Retired Senior Judge assigned to the Superior Court.

Victim"), when the Victim was 14 and 15 years old.[2] Commonwealth's Information, 10/17/14, at 1-2.

Appellant's case proceeded to a jury trial. During trial, the Victim testified that Appellant first abused him on May 31, 2013, which was the night before the wedding between Appellant and the Victim's cousin, JY. N.T. Trial, 7/14/15, at 38-39. As the Victim testified, he was asked to be a groomsman in Appellant's June 1, 2013 wedding to JY and, on the night before the wedding, the Victim slept over at the house that belonged to Appellant and JY. *Id.* at 38. Also sleeping in the house that night were the other groomsmen and Appellant; JY was not present that night, as she was with her bridesmaids at a bridal party. *Id.* The Victim testified:

> Everyone basically was up for a while and went to sleep. There was nowhere else to sleep. It was a relatively small house. So I just slept in the same bed with [Appellant] because I knew him obviously and then like toward the middle of the night he woke me up and asked to show me something. . . . I said, "What?" And he said to take off my pants. And I got very nervous and very scared and my mind went blank. I just did it and he started touching me.

*Id.* at 38-39. According to the Victim, Appellant touched the Victim's penis with his hand until the Victim ejaculated; after the Victim ejaculated, Appellant touched himself until he also ejaculated. *Id.* at 39-40.

---

[2] During Appellant's trial, the Victim testified that he was born in February 1999. N.T. Trial, 7/14/15, at 39.

Afterwards, Appellant told the Victim "don't tell anyone" and that "it was normal." *Id.* at 40.

The Victim recalled that Appellant next molested him "a few months later," inside of Appellant and JY's house. According to the Victim:

> I was getting ready to go into the shower and [Appellant] came in and all I had was my underwear on and he picked me up and threw me onto his bed and started wrestling with me. And he took my underwear and said, "If you want to win the underwear back, you have to win the game."
>
> I didn't know what the game was or how to win. I just kept trying to get my underwear back and I grew tired and he started touching me.

*Id.* at 42. The Victim testified that Appellant again touched him on his penis. *Id.* The Victim testified: "I just continued to be really scared, but then he took off his clothes and pulled my hand to touch him. . . . [Appellant] kept holding my hand [on Appellant's penis] and holding it up and down until he ejaculated." *Id.* After this occurred, Appellant again told the Victim "don't tell anyone." *Id.* at 43.

The third occurrence of sexual abuse happened in the following manner:

> The next incident was another one where we were, like, wrestling again.
>
> . . . It was just like it sort of started about the same way where I was getting ready to do something. He would pick me up and continue to take my clothes off and I would just not know what to do -- be doing. I was like scared almost, but because I didn't know what was going to happen afterward, but he just continued to touch me and I got very nervous, almost shut down.

- 3 -

*Id.* at 43-44. The Victim testified that Appellant again touched "on my private area" and again told the Victim "don't tell anyone." *Id.* at 44.

With respect to the fourth time that Appellant molested the Victim, the Victim testified:

> There was another incident where I was getting ready to go to work. At the time I worked in Wilkinsburg and [Appellant] offered to give me a ride, but the only way I would get a ride there was if I were to spend the night at his house and I was very reluctant to go to his house. But I though [JY] would be there, but she was not.
>
> And when I went there everything was fine at night, but in the morning right around the time when I woke up he just started wrestling with me again and he started to take my clothes off, but I just kept trying to push him away and he wasn't moving and he started tickling me and I sort of grew weaker and I just fell limp.
>
> . . .
>
> I kept saying stop and no and no and no, but he just kept going. . . . He just continued to touch me and I just felt so weak. I just went blank for a while and he continued to touch me and touch me and I just got sick again and he drove me to work.

*Id.* at 44-45. As the Victim later specified, during this time Appellant touched the Victim on the Victim's "privates." *Id.* at 45.

Appellant's final act of molestation occurred over Labor Day weekend of 2014. The Victim testified:

> I was, again, over at their house and also I did think [JY] would be there, but she was not. I went to bed[, wearing pajama pants and underwear]. Nothing happened. But as I was starting to wake up, I saw this object under the covers and I was wondering what it was. At first I thought it was

the cat and then I realized it was too big to be a cat. Then I thought it was a pillow and it was moving . . . up and down.

*Id.* at 45-46. As the Victim testified, when he saw the movement underneath the covers, he felt "like a scratching between [his] legs" and a wetness on his "private parts." *Id.* The Victim testified that the object then "disappeared." *Id.* However, when the Victim fully woke, he realized that he was naked – even though he was wearing "black pajama pants with underwear underneath" when he went to sleep. *Id.*

The Victim testified:

> I was very in shock so I went to the bathroom and did what I normally do, which is run my hands under scalding hot water. And I was very reluctant to talk about it, but I asked [Appellant] about it and he said he was asleep the whole time and had no idea what I was talking about.

*Id.* at 46-47.

Nevertheless, the Victim testified, he knew that Appellant was underneath his covers because "there [were] no other moving objects in that house besides the cats and [Appellant]" and the object was "too big to be a cat." *Id.* at 47. The Victim also testified that the "wetness" he felt was Appellant's mouth around his penis. *Id.*

One week after the fifth act of molestation occurred, the Victim told his mother what had happened and the Victim's mother informed the police. *Id.* at 50.

The Commonwealth presented testimony from the Victim's mother and JY and rested its case. Appellant then presented testimony from Russell

Brown, Justin McIntyre, Juan Ortiz, and Christopher Johns – all of whom were groomsmen at Appellant's July 1, 2013 wedding and all of whom slept over at Appellant's house on the night before the wedding, when, the Victim testified, Appellant first abused him. Each groomsman testified that: on the night before the wedding, they met at a rehearsal dinner; after the dinner, Appellant and the groomsmen (including the Victim) went back to Appellant's house; Appellant, the Victim, and the groomsmen slept over at Appellant's house that night; and, Appellant, the Victim, and the groomsmen were the only individuals in Appellant's house that night. However, some of the groomsmen offered slightly different testimony about what occurred at Appellant's house and where the events occurred.

Russell Brown testified that, when everyone went back to Appellant's house, they "just watched a movie [and] played some video games." N.T. Trial, 7/15/15, at 117. Mr. Brown testified that, after Juan Ortiz went to bed in the basement, "everybody else went upstairs" and went to bed. *Id.* at 125. According to Mr. Brown: he slept in the living room; Justin McIntyre and Chris Johns also slept in the living room; Juan Ortiz slept in the basement; Appellant slept in the master bedroom; and, the Victim slept in the separate, guest room. *Id.* at 118-119. According to Mr. Brown: he saw the Victim enter the guest room to go to sleep; he saw the Victim close the door to the guest room; he saw Appellant go into the master bedroom to sleep; he awoke once in the middle of the night to go to the bathroom and saw Appellant's bedroom door open and the guest room door closed; he

never heard any noise coming from Appellant's bedroom during the night; and, when everyone awoke in the morning, the Victim did not appear to be "distressed" or "unnerved." *Id.* at 119-121.

Justin McIntyre testified next. As Mr. McIntyre testified, on the night before the wedding, Appellant and the groomsmen arrived at Appellant's house and everyone played the videogame "Mario Party" in the living room. *Id.* at 139 and 148. Mr. McIntyre testified that, after they finished playing the videogame, everyone went to sleep. According to Mr. McIntyre: he slept on the floor in the living room; Chris Johns and Russell Brown also slept in the living room; he saw the Victim enter the guest room; and, after he saw the Victim go into the guest room, he saw Appellant enter the master bedroom. *Id.* at 139-140 and 152.

During the Commonwealth's cross-examination of Mr. McIntyre, the following questions, testimony, objection, and exchanges occurred:

Q: What games were you playing?

A: Mario Party.

Q: Who is all playing these games? Was everybody playing those games?

A: Yes, sir.

Q: Did you watch a movie?

A: I don't remember.

Q: You don't remember if you watched a movie?

A: I don't think I watched a movie.

Q: Okay. If I told you that Russell [Brown] said that you watched a movie, would he be telling the truth or lying?

> [Appellant's Counsel]: Judge, I object. He just said he didn't remember.

> [The Commonwealth]: Judge, this is cross-examination.

> [Appellant's Counsel]: How can he –

> [Trial Court]: All right. It is cross-examination. He can answer the question.

A: He was probably telling the truth. I don't recall watching one. I probably did.

*Id.* at 148.

Mr. McIntyre's testimony continued:

Q: Now, you said that you were all in the living room [playing videogames and watching the movie], is that right?

A: Yes, sir.

Q: Okay; and what floor of the house is that on?

A: The first floor.

Q: The first floor; and you said that [Juan Ortiz] slept in the basement?

A: Yes, sir.

Q: If I told you that Russell [Brown] told everybody that everybody hung out in the basement first, then went upstairs, would that be the truth or would he be lying?

A: I don't know.

Q: Well, you're saying that everybody hung out upstairs, is that correct?

A: Yes, sir.

Q: And Russell said everybody was downstairs. So are you lying?

A: The -- it could be upstairs or downstairs. I'm pretty sure it was upstairs, because the TV was upstairs, and there's ample room upstairs; plus, we have had a game downstairs in the basement in the past.

Q: So you don't know where you were that night?

A: We were upstairs.

Q: So then Russell [Brown] was lying?

> [Appellant's Counsel]: Judge, let me interject. He's saying, then Russell was lying. He's just explained --
>
> [Trial Court]: This is cross-examination. The witness answered fine just for the last time. He can answer this time.

A: I guess so.

*Id.* at 149-150.

Juan Ortiz next testified for Appellant. Mr. Ortiz testified that, when they arrived at Appellant's home, everyone went into the basement, where they played the videogame "Super Smash Brothers" and watched the movie "Ghostbusters". *Id.* at 156-157 and 162-163. After the movie, Mr. Ortiz testified, he stayed in the basement to sleep and everyone else went upstairs. *Id.* at 163.

Christopher Johns then testified. According to Mr. Johns, after the rehearsal dinner, everyone arrived at Appellant's house and "just relax[ed], [hung] out in the living room, [and] play[ed] some games . . . in the living

room." **Id.** at 166 and 171. Mr. Johns testified: he slept in the living room with Russell Brown and Justin McIntyre; he saw Appellant go to sleep in "his own bedroom;" and, he saw that the Victim "had his stuff set up in the guest bedroom," saw the Victim "go down the hall towards his room," and "assumed that [the Victim] would go into his room where all his stuff was set up." **Id.** at 167. Mr. Johns also testified that it took him a long time to fall asleep and, while he was awake, he did not "hear any doors closing, opening, or any other sounds that drew [his] attention." **Id.** at 168.

Appellant testified on his own behalf. According to Appellant, on the night before the wedding:

> We got in [to my house]. We sat up. We played some videogames. We watched a movie. I didn't specifically know which video games. I heard today, but I didn't specifically know then. We watched ["]Ghostbusters["], I did remember that; and then afterwards we pretty much went to bed.
>
> There was a blow-up mattress in the basement for [Juan Ortiz,] which is where he slept. I'd offered the futon to Justin McIntyre. I don't know if he actually slept there. I heard today he didn't.
>
> I went to bed after I had showed [the Victim] to his room, which [is where] he had stuff set up, which was the spare bedroom; and then [Russell Brown] slept on the small couch. There's this larger couch. He always sleeps on the weird, like, love seat for some reason. Then Chris [Johns] typically sleeps on the floor.

**Id.** at 186-187.

Appellant testified that he went to sleep in the master bedroom and that the Victim did not go into the bed with him. **Id.** at 188.

Appellant testified that, after that night, the Victim visited Appellant's house "at least two" other times and, when the Victim slept over, Appellant's wife was always home and the Victim slept in the basement. *Id.* at 193. Appellant denied ever sexually molesting or abusing the Victim. *Id.* at 196-212.

After Appellant's testimony, the Commonwealth presented two rebuttal witnesses and the evidentiary portion of the trial ended. During the Commonwealth's closing argument, the Commonwealth told the jury the following:

> Now, think about [the Victim's] testimony. If he didn't know the answer to the question, he told you, he didn't know. If he didn't remember the answer to the question, he told you, he didn't remember. If he was lying, he would have an answer for everything. He didn't; and he didn't because he was telling you the truth; and the truth is that this man, and I don't even know if he should be dignified with that "man" title, abused a 14 year old, abused a 15 year old, took advantage of the relationship he built; and he took advantage of it by, first, the defendant using his hands to rub the victim's penis.

N.T. Trial, 7/16/15, at 301. Appellant did not immediately object to the above statement. Rather, Appellant waited until the Commonwealth had finished its closing statement to approach the bench. There, the following exchange occurred:

> [Appellant's Counsel]: Judge, I just want to place an objection on the record to one remark that was made by the prosecution. He referred to [Appellant] as a person that does not . . . deserve the title of a man; and in that implication, reducing him to something other than a man, and, quite frankly, I think it's prejudicial for his remark that

he is less than human.  I think it prejudices the jury, and ask you to instruct them to disregard his remark about him. You can't refer to somebody as less than human.

[Trial Court]:  I think that is perfectly within his purview in the form of argument in a case like this.

[Appellant's Counsel]:  My objection is on the record.

[Trial Court]: So noted.

*Id.* at 309.

The jury found Appellant guilty of corruption of minors and two counts of indecent assault.[3]  N.T. Trial, 7/17/15, at 2.  On October 21, 2015, the trial court sentenced Appellant to serve an aggregate term of nine-and-a-half to 19 months in jail, followed by five years of probation, for his convictions.  Appellant filed a timely post-sentence motion on Monday, November 2, 2015, which the trial court denied on December 17, 2015. Appellant filed a timely notice of appeal and now raises three claims to this Court:

> 1. Whether the trial court erred and/or abused its discretion in allowing the prosecutor to ask an improper question concerning whether one witness would know the state of mind of another witness, *i.e.* whether that witness was lying?
>
> 2. Whether the trial court erred and/or abused its discretion in failing to sustain an objection as to the prosecutor's comment that reduced Appellant to something other than a man?

---

[3] The jury found Appellant not guilty of IDSI and unlawful contact with a minor.  N.T. Trial, 7/17/15, at 2.

3. Whether the sentence prohibiting Appellant from having access to the internet was illegal?

Appellant's Brief at 7.[4]

Appellant first claims that the trial court erred when it allowed the Commonwealth to question one of Appellant's witnesses about the credibility of another one of Appellant's witness. This issue challenges an evidentiary ruling by the trial court. We have explained:

> [Our] standard of review for a trial court's evidentiary rulings is narrow. The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise

---

[4] The trial court ordered Appellant to file and serve a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). Trial Court Order, 1/15/16, at 1. Appellant complied and, within his Rule 1925(b) statement, Appellant listed the following, relevant issues:

> [1.] Whether the trial court erred and/or abused its discretion in allowing the prosecutor to ask an improper question concerning whether one witness would know the state of mind of another witness, *i.e.* whether that witness was lying (TT, Vol. II, 150).
>
> . . .
>
> [2.] Whether the trial court erred and/or abused its discretion in failing to sustain an objection as to the prosecutor's comment that reduced Appellant to something other than a man? (TT, Vol. II, 309). *See* (TT, Vol. II, 301).

Appellant's Rule 1925(b) Statement, 2/5/16, at 1.

of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Mendez*, 74 A.3d 256, 260 (Pa. Super. 2013) (internal quotations and citations omitted). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa. Super. 2012) (internal quotations and citations omitted). "A party suffers prejudice when the trial court's error could have affected the verdict." *Commonwealth v. Tyack*, 123 A.3d 254, 257 (Pa. Super. 2015) (internal quotations and citations omitted).

Contrariwise, "an erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error was harmless." *Commonwealth v. Chmiel*, 889 A.2d 501, 521 (Pa. 2005). Our Supreme Court has held:

> Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* (internal quotations and citations omitted). "An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict." *Id.* at 528. "If there is a reasonable possibility that the error may have contributed to the

- 14 -

verdict, it is not harmless. The burden of establishing that the error was harmless rests upon the Commonwealth." *Id.* (internal citations omitted).

According to Appellant, the trial court erred when, over objection, it permitted one of Appellant's witnesses (Justin McIntyre) to testify as to the veracity of another one of Appellant's witnesses (Russell Brown).

By way of background, during Russell Brown's testimony, Mr. Brown testified that, on the eve of Appellant's wedding, the group went back to Appellant's house and "just watched a movie [and] played some video games." N.T. Trial, 7/15/15, at 117. Moreover, during Mr. Brown's testimony, Mr. Brown testified that the group watched the movie and played the videogames in the basement. *See id.* at 125.

Justin McIntyre testified a little differently than did Mr. Brown. Specifically, Mr. McIntyre testified that, when the group arrived at Appellant's house on the eve of the wedding, the group played a videogame in the living room of the house – not in the basement. *See id.* at 150. Mr. McIntyre also testified that he could not remember whether the group also watched a movie that night. *Id.* at 148. Then, during the cross-examination of Mr. McIntyre, the Commonwealth asked Mr. McIntyre: 1) whether Russell Brown was "telling the truth or lying" when Mr. Brown testified that the group also watched a movie that night and 2) whether Mr. Brown "was lying [when he testified that] . . . everybody was downstairs." *Id.* at 148 and 150.

Within Appellant's brief to this Court, Appellant claims that the trial court erred when it overruled his objections to both questions. ***See*** Appellant's Brief at 17-27. However, within Appellant's Rule 1925(b) statement, Appellant only claimed that the trial court erred when it overruled his objection at page 150 of the trial transcript. ***See*** Appellant's Rule 1925(b) Statement, 2/5/16, at 1 ("[w]hether the trial court erred and/or abused its discretion in allowing the prosecutor to ask an improper question concerning whether one witness would know the state of mind of another witness, *i.e.* whether that witness was lying (**TT, Vol. II, 150**)") (emphasis added). As noted above, the objection and ruling on the question of whether Russell Brown was "telling the truth or lying" when Mr. Brown testified that the group watched a movie occurred on page 148 of the trial transcript; the objection and ruling on the question of whether Mr. Brown "was lying [when he testified that] . . . everybody was downstairs" occurred on page 150 of the transcript. Since Appellant's Rule 1925(b) statement specified error only in regard to the latter issue, Appellant's claim with respect to the former issue is waived. Pa.R.A.P. 1925(b)(4)(vii) ("[i]ssues not included in the [Rule 1925(b) s]tatement . . . are waived"). We will now consider whether the trial court erred when, over objection, it permitted Justin McIntyre to testify that Mr. Brown "was lying [when he testified that] . . . everybody was downstairs." We conclude that the trial court erred in its evidentiary ruling, but that the error was harmless beyond a reasonable doubt.

At the outset, the Pennsylvania Supreme Court has consistently held that "expert testimony is not permissible as to the question of witness credibility." *Commonwealth v. Alicia*, 92 A.3d 753, 760 (Pa. 2014). As our Supreme Court explained, this is because

> The veracity of a particular witness is a question which must be answered in reliance on the ordinary experiences of life, common knowledge of the natural tendencies of human nature, and observations of the character and demeanor of the witness. As the phenomenon of lying is within the ordinary capacity of jurors to assess, the question of a witness's credibility is reserved exclusively for the jury.

*Id.* at 761 (internal quotations, citations, and corrections omitted).

Further, this Court has held that lay witnesses are generally not permitted to opine upon the credibility of a defendant. *Commonwealth v. McClure*, 144 A.3d 970 (Pa. Super. 2016). In *McClure*, the defendant was on trial for assaulting a five-month-old baby. During the defendant's trial, the trial court permitted the investigating detective to testify that "neither he nor [a Children and Youth Services] employee believed Appellant" when Appellant told them that "she had tripped while carrying [the victim] and fell, hitting [the victim's] head on a car seat." *Id.* at 973 and 977. On appeal, the defendant claimed that the trial court erred when it "permitt[ed the detective] to express opinions about [the defendant's] credibility." *Id.* at 977. This Court agreed with the defendant and held that such testimony was inadmissible, as it was irrelevant and impermissibly encroached upon

the exclusive province of the jury to determine the defendant's credibility.[5]

*Id.*

Moreover, as the Supreme Court of Colorado cogently explained, there are a number of additional reasons why it is generally impermissible to question one witness about his opinion concerning the veracity of another witness:

> First, . . . asking a witness to comment on the veracity of another witness offers little or no probative value. This kind of question seeks information beyond the witness's competence. And, where the witness expresses a belief as to the veracity of another witness, that statement of belief is simply irrelevant; it does nothing to make the inference that another witness lied any more or less probable. . . .
>
> Second, this form of questioning ignores numerous alternative explanations for evidentiary discrepancies and conflicts that do not involve lying. There may be differences in opinion, lapses or inaccuracies in memory, differences in perception, a misunderstanding, or any other number of wholly innocent explanations for discrepancies between one witness's testimony and another's. By asking a "were they lying" type of question, the possibilities are often falsely reduced to deliberate deception on the part of one or more witnesses. . . .
>
> Third, these questions infringe upon the province of the fact-finder and risk distracting the fact-finder from the task at hand. Credibility determinations are to be made by the fact-finder, not by the prosecutor or a testifying witness. A "were they lying" type of question infringes upon this role by asking the witness to make a credibility assessment and

---

[5] The **McClure** Court also held that the error in its case was prejudicial. Therefore, the Court reversed and remanded for a new trial. **McClure**, 144 A.3d at 977.

by the credibility assumptions built into the question itself. Moreover, while it is appropriate to juxtapose conflicting accounts of the facts and ask the fact-finder to resolve the dispute, it is not appropriate to compound that task by implying that the fact-finder must determine one or more of the witnesses is lying. This effectively distorts the government's burden of proof. In the criminal setting, this is particularly problematic as the fact-finder may assume that an acquittal turns upon finding that the other witness or witnesses lied.

Finally, asking "were they lying" questions is argumentative. These questions set one witness against another and call for the inference that someone is deliberately deceiving the court. . . . In responding to this line of questioning, the witness risks alienating the jury by appearing antagonistic or accusatory.

*Liggett v. People*, 135 P.3d 725, 731-732 (Colo. 2006) (*en banc*).

The holding of **McClure** and the convincing analysis from the **Liggett** Court lead us to conclude that "were they lying" questions are generally prohibited in Pennsylvania. Further, we conclude that the trial court erred when it overruled Appellant's objection and allowed Justin McIntyre to answer the question asking whether Russell Brown "was lying [when he testified that] . . . everybody was downstairs" playing videogames on the eve of Appellant's wedding. N.T. Trial, 7/15/15, at 150.

Nevertheless, the error in this case was harmless beyond a reasonable doubt. First, the question of whether Appellant, the Victim, and the groomsmen played videogames and watched a movie "in the living room" or "in the basement" before going to bed on the eve of the wedding is relevant only insofar as it completed the story regarding the group's activity on the night in question and tested the witnesses' recollection of the night's events.

In other words, the question concerned a wholly collateral issue. Second (and on a related note), Appellant, the Victim, and the groomsmen all testified that nothing untoward occurred "in the living room" or "in the basement" while they were playing videogames and watching the movie. Finally, the value of Russell Brown's testimony to Appellant was limited to his recollection of the sleeping arrangements – and Justin McIntyre, Christopher Johns, and Appellant all testified in an essentially identical manner to Russell Brown on this issue. Specifically, Russell Brown, Justin McIntyre, Christopher Johns, and Appellant all testified that, on the night in question: Russell Brown, Justin McIntyre, and Christopher Johns went to sleep in the living room; Juan Ortiz went to sleep in the basement; Appellant went to sleep in the master bedroom; and, the Victim went to sleep in the separate guest room. N.T. Trial, 7/15/15, at 118-119, 139-140, 152, 167-168, and 186-187. Thus, the only valuable portion of Russell Brown's testimony was cumulative of the testimony from Justin McIntyre, Christopher Johns, and Appellant.

Therefore, we conclude that the trial court's evidentiary error was harmless beyond a reasonable doubt, as the error did not prejudice Appellant. *Chmiel*, 889 A.2d at 521.

Second, Appellant claims that the trial court erred when it overruled his objection to the Commonwealth's closing argument, where the Commonwealth declared, in reference to Appellant: "and the truth is that this man, and I don't even know if he should be dignified with that 'man'

title." Appellant's Brief at 28; N.T. Trial, 7/16/15, at 301. Again, we conclude that the trial court erred in overruling Appellant's objection, but that the error does not require a new trial.

Our Supreme Court has held:

> A prosecutor has great discretion during closing argument and is free to present his or her closing arguments with logical force and vigor. Thus, [the Supreme Court] will allow vigorous prosecutorial advocacy if there is a reasonable basis in the record for the prosecutor's comments. Stated differently, prosecutorial comments based on the evidence or reasonable inferences therefrom are not objectionable, nor are comments that merely constitute oratorical flair. In reviewing an allegation of prosecutorial misconduct, we will find that comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and reach a fair verdict.

*Commonwealth v. Cash*, 137 A.3d 1262, 1273 (Pa. 2016) (internal citations, quotations, and corrections omitted). The trial "court must discern whether misconduct or prejudicial error actually occurred, and if so, . . . assess the degree of any resulting prejudice." *Commonwealth v. Judy*, 978 A.2d 1015, 1019 (Pa. Super. 2009). "Our review [] is [then] constrained to determining whether the court abused its discretion." *Id.*

As noted above, during the Commonwealth's closing, the Commonwealth argued to the jury the following:

> Now, think about [the Victim's] testimony. If he didn't know the answer to the question, he told you, he didn't know. If he didn't remember the answer to the question, he told you, he didn't remember. If he was lying, he would

have an answer for everything. He didn't; and he didn't because he was telling you the truth; and the truth is that this man, and I don't even know if he should be dignified with that "man" title, abused a 14 year old, abused a 15 year old, took advantage of the relationship he built; and he took advantage of it by, first, the defendant using his hands to rub the victim's penis.

N.T. Trial, 7/16/15, at 301.

Appellant objected at the conclusion of the Commonwealth's closing and argued:

Judge, I just want to place an objection on the record to one remark that was made by the prosecution. He referred to [Appellant] as a person that does not . . . deserve the title of a man; and in that implication, reducing him to something other than a man, and, quite frankly, I think it's prejudicial for his remark that he is less than human. I think it prejudices the jury, and ask you to instruct them to disregard his remark about him. You can't refer to somebody as less than human.

*Id.* at 309.

The trial court overruled Appellant's objection and refused to give the requested curative instruction.[6] Nevertheless, when court reconvened, the

---

[6] Although Appellant waited until the end of the Commonwealth's closing argument to object, the delay does not result in waiver of the claim on appeal. **Commonwealth v. Rose**, 960 A.2d 149, 154 (Pa. Super. 2008) ("we note that Rose's counsel did not object immediately; rather, he waited until the end of the prosecutor's closing argument to object and to request a mistrial. Our Supreme Court has held that such a delay does not result in waiver so long as: (1) there is no factual dispute over the content of the prosecutor's argument (*e.g.,* the argument was recorded and available for review at trial); and (2) counsel objects immediately after closing argument with sufficient specificity to give the court the opportunity to correct the prejudicial effect of the improper argument. **Commonwealth v. Adkins**, 364 A.2d 287, 291 (Pa. 1976). Such is the case here. Accordingly, we

*(Footnote Continued Next Page)*

trial court instructed the jury: "I caution you not to allow sympathy, prejudice, or any emotion to influence your decision. It is your duty to base your decision strictly on the evidence." *Id.* at 310-311.

Appellant now claims that the trial court's ruling is erroneous and that the error requires a new trial. We agree that the trial court should have sustained Appellant's objection, but that the error does not warrant a new trial.

Initially, we conclude that the trial court erred when it overruled Appellant's objection to the Commonwealth's closing argument. To be sure, the Commonwealth's statement – that Appellant possibly did not deserve to be called a "man" – did not constitute a comment upon the evidence, was not a fair response to a point made by Appellant in his closing, and was not permissible "oratorical flair." The comment simply had no place in this case and is not condoned by this Court.

However, the Commonwealth's passing reference to Appellant as possibly not deserving the title "man" does not warrant a new trial. Indeed, the objectionable comment was a single, passing reference in a closing argument that spanned 16 transcript pages; the comment was phrased as a "possibility;" the comment "was not of such a nature that it would seriously

(Footnote Continued) ————————

conclude that the issue is not waived for failure to timely object") (internal footnote and some internal citations omitted).

affect the jury's objectivity or deprive Appellant of a fair trial;" and, the trial court specifically instructed the jury "I caution you not to allow sympathy, prejudice, or any emotion to influence your decision. It is your duty to base your decision strictly on the evidence." **Commonwealth v. Gruff**, 822 A.2d 773, 783 (Pa. Super. 2003); N.T. Trial, 7/16/15, at 310-311. Moreover, as the Commonwealth notes, Appellant only objected to the comment after the Commonwealth finished its closing argument – and, Appellant only requested that the trial court issue a curative instruction and order that the jury "disregard [the] remark about [Appellant]." N.T. Trial, 7/16/15, at 309. However, if the trial court were to have done as Appellant wished, the trial court would have necessarily had to repeat the objectionable comment or remind the jury of the comment. Practically speaking, given Appellant's late objection, the trial court's actual instruction to the jury – "I caution you not to allow sympathy, prejudice, or any emotion to influence your decision. It is your duty to base your decision strictly on the evidence" – was **more favorable to Appellant** than was Appellant's requested form of relief.

Therefore, we conclude that the Commonwealth's objectionable comment did not cause Appellant prejudice. Appellant's claim on appeal fails.

Finally, Appellant superficially claims that "the trial court imposed an illegal sentence by [imposing a condition of probation that] prohibit[s] Appellant from access to the internet." Appellant's Brief at 33 and 35. However, within the argument section of Appellant's brief, Appellant merely

- 24 -

claims that "[t]here was **no evidence presented** [at trial] to show that [Appellant] used the internet or his computer to gain access to sexually explicit material and/or to communicate with children to develop inappropriate relationships" and, thus, the restriction is not "reasonably related to Appellant's rehabilitation." *Id.* at 35 (internal quotations and citations and some capitalization omitted) (emphasis added). This is a challenge to the discretionary aspects of Appellant's sentence – not to the legality. *See Commonwealth v. Hartman*, 908 A.2d 316, 319 (Pa. Super. 2006) (as a condition of probation, the trial court ordered that the defendant was prohibited from using a computer, accessing the internet, and owning a cell phone; the defendant appealed, claiming that the conditions were "not reasonably related to [his] rehabilitation, are incompatible with [his] freedom of conscience, and are unduly restrictive;" this Court held that the defendant's claim was a challenge to the discretionary aspects of his sentence); *Commonwealth v. Houtz*, 982 A.2d 537, 539-540 (Pa. Super. 2009) (the defendant claimed that the trial court erred in prohibiting his use of a computer and access to the internet because the prohibition was "not tailored to the offense committed since there is no record that [the defendant] ever used the computer to access inappropriate materials or otherwise acted in such a way that would justify such dramatic restrictions;" this Court held that the claim was a "challenge[ to] the discretionary aspects of sentencing, not the legality of the sentence imposed"); *but see Commonwealth v. Wilson*, 67 A.3d 736 (Pa. 2013) (a claim that the trial

court **did not have statutory authority to impose a particular condition of probation** is a challenge to the legality of a sentence).

Appellant did not preserve his discretionary aspects of sentencing claim at sentencing or in a post-sentence motion. Therefore, the claim is waived.[7] Pa.R.Crim.P. 720; Pa.R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/4/2017

_____

[7] Appellant also waived the claim because he did not include the claim in his Rule 1925(b) statement. Pa.R.A.P. 1925(b)(4)(vii) ("[i]ssues not included in the [Rule 1925(b) s]tatement . . . are waived").