J-S56011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| BRIAN SANCHEZ-PADILLA | : | |
| | : | |
| Appellant | : | No. 1898 MDA 2017 |

Appeal from the Judgment of Sentence October 4, 2017
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s):  CP-36-CR-0002281-2017

BEFORE:  GANTMAN, P.J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED NOVEMBER 14, 2018**

Appellant, Brian Sanchez-Padilla, appeals from the judgment of sentence entered in the Lancaster County Court of Common Pleas, following his jury trial convictions for aggravated assault and resisting arrest.[1]  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no need to restate them.

Appellant raises the following issues for our review:

> DID THE TRIAL COURT ERR IN FINDING [APPELLANT]
> COMPETENT TO BE TRIED, WHERE [APPELLANT] PROVED
> BY A PREPONDERANCE OF THE EVIDENCE THAT [HE] WAS
> SUBSTANTIALLY UNABLE TO UNDERSTAND THE NATURE OR
> OBJECT OF THE PROCEEDINGS AGAINST HIM OR TO

---

[1] 18 Pa.C.S.A. §§ 2702(a)(1) and 5104, respectively.

J-S56011-18

PARTICIPATE AND ASSIST IN HIS DEFENSE?

DID THE TRIAL COURT ERR IN PERMITTING EMT EMMA EINWECHTER TO TESTIFY TO THE EFFECTS OF K2, WHERE SHE WAS NOT QUALIFIED AS AN EXPERT WITNESS, AND HER TESTIMONY WAS NOT PROPER AS A LAY WITNESS, AS SHE DID NOT OBSERVE [APPELLANT]'S INTERACTIONS WITH POLICE AT THE PARK?

DID THE TRIAL COURT ERR IN FINDING THE DEADLY WEAPON USED ENHANCEMENT APPLIED TO ANY OF [APPELLANT]'S OFFENSES, WHERE THERE WAS NO EVIDENCE THAT [APPELLANT] USED A PEN TO ATTACK EITHER POLICE OFFICER, AND THE PEN DID NOT FIT THE DEFINITION OF A DEADLY WEAPON, NOR WAS IT USED AS A DEADLY WEAPON?

WAS THE AGGREGATE SENTENCE OF THE COURT MANIFESTLY EXCESSIVE AND AN ABUSE OF THE COURT'S DISCRETION, WHERE THE COURT CLASSIFIED FAILURE OF A MENTALLY ILL PERSON TO TAKE MEDICATION AS AN AGGRAVATING CIRCUMSTANCE, AND IT CITED IMPROPER AND INADEQUATE AGGRAVATING FACTORS FOR THE SENTENCE IMPOSED?

(Appellant's Brief at 8-9).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Donald R. Totaro, we conclude Appellant's issues merit no relief. The trial court's opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, filed February 5, 2018, at 4-18, 23-39) (finding: **(1)** Appellant failed to establish he was incompetent to stand trial[2]; court rejected

_____

[2] We depart from the trial court's analysis to the extent it relies upon Appellant's conduct in other proceedings and a separate expert psychiatrist's report the court considered at sentencing.

- 2 -

testimony and report of Appellant's competency expert, licensed psychologist Dr. Robert Stein; **(2)** Commonwealth offered testimony of Emma Einwechter, EMT who interacted with Appellant immediately after altercation in park, to rebut Appellant's trial testimony that he did not use drugs on day of incident; Ms. Einwechter testified that, in course of her work as EMT, she dealt with individuals who had ingested K2, synthetic marijuana, and saw effects of K2; Ms. Einwechter explained she observed some people who had ingested K2 were tranquil, while others were extremely violent and required chemical sedation; to extent Appellant argues Commonwealth failed to present evidence Appellant had used drugs on day of incident, his argument fails; Ms. Einwechter testified Appellant admitted he had used K2 earlier that day; further, testimony established police found in park near Appellant baggies typically possessed by drug users; to extent Appellant argues Ms. Einwechter's testimony was irrelevant because she did not observe Appellant's conduct in park, his argument fails; Ms. Einwechter personally interacted with Appellant mere thirteen minutes after Appellant was removed from park; to extent Appellant argues Ms. Einwechter's testimony constitutes improper expert testimony, his argument also fails; Ms. Einwechter did not offer expert or lay opinion on whether Appellant was under influence of K2; rather, she testified to her observations of Appellant and her prior experience with individuals who had used K2; Appellant failed to show Ms. Einwechter's testimony about effects of K2 use was erroneously allowed or based on manifest

unreasonableness, partiality, prejudice, bias, or ill-will; moreover, even if court improperly permitted Ms. Einwechter to testify, court's ruling constitutes harmless error, in light of other properly admitted overwhelming trial evidence of Appellant's guilt; **(3)** at trial, Officer Herr testified Appellant used pen to stab Officer Deitz in leg and face; further, two other officers testified they observed wounds on Officer Deitz consistent with stab wounds inflicted with sharp object; photographs of Officer Deitz after incident showed two puncture wounds near his right eye and cuts on his face; testimony established Appellant used pen as weapon to stab officer; also, Appellant's argument that pen does not constitute deadly weapon fails, where Appellant intentionally used pen to stab Officer Deitz, who sustained puncture wounds near eye consistent with punctures from pen; pen was capable of producing serious bodily injury or blindness; Appellant also used pen to threaten assault on Officer Herr, although Appellant did not injure Officer Herr with pen; deadly weapon enhancement applied to Appellant's use of pen to threaten/assault both officers; **(4)** court sentenced Appellant with benefit of pre-sentence investigation ("PSI") report; at sentencing, court stated it considered all information in PSI report, including Appellant's mental health history, Appellant's character, background, age, work history, education, ability to speak and understand English, substance abuse, and prior criminal record; to extent Appellant argues court failed to consider his mental illness as mitigating factor, his argument fails; sentencing court did not inhibit or deprive Appellant

of access to mental health care; rather, court made Appellant eligible for all available treatment programs for substance addiction and anger management; court also considered nature and circumstances of current offenses as well as gravity of offenses and effect of offenses on Victims and community; court considered Appellant's rehabilitative needs; additionally, record indicates Appellant has failed to try to change his lifestyle and is not amenable to rehabilitation; based on foregoing, sentence was not manifestly excessive). The record supports the trial court's rationale. Accordingly, we affirm on the basis of the trial court opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/2018

# IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
## CRIMINAL

COMMONWEALTH OF PENNSYLVANIA  :

:  1898 MDA 2017

vs.  :

:  CP-36-CR-0002281-2017

BRIAN SANCHEZ-PADILLA  :  *C*

## PA R.A.P. 1925 OPINION

BY TOTARO, J.

On September 27, 2017, Brian Sanchez-Padilla ("Appellant") was found guilty of two counts of aggravated assault and one count of resisting arrest. Presently before the Superior Court of Pennsylvania is an appeal from the order entered on November 7, 2017, which denied Appellant's post-sentence motion. For the reasons stated herein, the appeal should be denied.

## PROCEDURAL AND FACTUAL BACKGROUND

On April 16, 2017, police found Appellant sleeping in a public park in violation of a Lancaster City ordinance. *See* Police Criminal Complaint and Affidavit of Probable Cause. While being cited for violating the ordinance, Appellant became belligerent towards the officers. *Id.* As they attempted to take him into custody for disorderly conduct, Appellant resisted and began physically assaulting the officers. *Id.* During the struggle that ensued, Appellant allegedly punched one officer in the head, repeatedly slammed another officer's head into the concrete ground, and stabbed one of the officers several times in the thighs and face with a pen. *Id.* Both officers were transported to the hospital for injuries sustained in the altercation. *Id.* Appellant was charged with two counts of aggravated assault (F1), two counts of resisting arrest, disorderly conduct, and an ordinance violation. *See* Information.

Based on these new criminal charges, and because he left a mental health program against medical advice six days before the new offenses occurred, Appellant appeared before the court on May 15, 2017 for a parole/probation violation ("PV") hearing involving six prior criminal dockets.[1] (Notes of Testimony, PV Hearing at 2-3, 7) (hereinafter "N.T.PV."). Appellant was found in violation of parole and/or probation, they were revoked, a pre-sentence investigation report ("PSI") was ordered, and sentencing was deferred pending disposition of the new criminal charges. *Id.* at 10-11.

On August 2, 2017, Appellant filed a motion stating he was not competent to stand trial. *See* Motion For In Court Determination of Competency. A competency hearing was held on September 6, 2017. (Notes of Testimony, Competency Hearing at 4) (hereinafter "N.T.C."). On September 7, 2017, the court entered an order determining that Appellant was competent to stand trial. *See* Order, 9/7/17.

On September 27, 2017, a jury found Appellant guilty of two counts of aggravated assault (F1) and one count of resisting arrest.[2] (Notes of Testimony, Trial at 523) (hereinafter "N.T."). Because a PSI had been completed, the case proceeded to sentencing. *Id.* at 525-27. On October 4, 2017, Appellant was directed to undergo imprisonment in the state correctional institution ("SCI") for 5 to 10 years on each count of aggravated assault, and 6 months to 2 years for the charge of resisting arrest. (Notes of Testimony, Sentencing at 47) (hereinafter "N.T.S."). The

---

[1] Of relevance to the PV hearing, Appellant pleaded guilty on May 19, 2014 to one count of identity theft at docket #0413-2014, one count of forgery at docket #0522-2014, and one count of forgery at docket #0534-2014. *See* Sentencing Orders. On February 18, 2016, Appellant pleaded guilty to reckless burning or exploding at docket #3363-2015, aggravated harassment by prisoner at docket #3761-2015, and criminal mischief at docket #5530-2015. *See* Sentencing Orders.

[2] 18 Pa.C.S.A. § 2702(a)(1) and 18 Pa.C.S.A. § 5104, respectively.

2

sentences were made consecutive to one another, and consecutive to the sentences imposed on the PV violations, for an aggregate sentence of 12-27 years incarceration. *Id.* at 48-49.[3] Appellant was made eligible for all treatment programs. *Id.* at 46, 48.

On October 19, 2017, Appellant filed an amended motion to modify sentence. *See* Amended Post-Sentence Motion to Modify Sentence. The Commonwealth filed a response in opposition. *See* Commonwealth's Response to the Defendant's Post-Sentence Motion. On November 7, 2017, the court entered an order denying the amended post-sentence motion.[4]

On December 7, 2017, Appellant timely filed a Notice of Appeal. On December 28, 2017, Appellant filed a Statement of Errors Complained of on Appeal ("Statement") alleging the trial court committed error by: (1) finding that Appellant was competent to stand trial; (2) permitting an EMT to testify to the effects of K2; (3) instructing the jury that it could consider the EMT's testimony regarding Appellant's statement of K2 use for the truth rather than for impeachment purposes; (4) instructing the jury that voluntary intoxication is not a defense; (5) finding that the deadly weapon enhancement applied to any of the offenses; (6) imposing an aggregate sentence that was manifestly excessive and an abuse of the court's discretion; and (7) setting forth improper and inadequate reasons for the aggregate sentence imposed. *See*

---

[3] Appellant was continued on probation at docket numbers 0413-2014, 0522-2014, and 0534-2014. (N.T.S. at 45). For aggravated harassment by prisoner at docket #3671-2015, Appellant was directed to serve the unexpired term. *Id.* at 46. For reckless burning or exploding at docket #3363-2015, and criminal mischief at docket #5530-2015, parole on the split sentences was terminated effective immediately and Appellant was directed to undergo imprisonment in SCI for a period of 1½ to 5 years on the probation violations. *Id.* at 45-46. All sentences were made concurrent to one another. *Id.* at 46.

[4] On November 6, 2017, Appellant filed an amended Notice of Appeal to the Superior Court in relation to the PV cases. *See* 1737 MDA 2017. On November 28, 2017, Appellant timely filed a Statement of Errors Complained of on Appeal, claiming the trial court erred in finding he was competent to be sentenced for the PV violations. *See* Statement. That appeal is still pending.

3

Statement. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

## DISCUSSION

**I. Did the Trial Court Err By Concluding Appellant was Competent to Stand Trial?**

Appellant first claims the trial court erred in finding that he was competent to stand trial because counsel proved that Appellant was substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense. *See* Statement.

The Pennsylvania Mental Health Procedures Act states in relevant part:

> Whenever a person who has been charged with a crime is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent to be tried, convicted or sentenced so long as such incapacity continues.

50 P.S. § 7402(a).

The test to be applied in determining the legal sufficiency of a defendant's mental capacity to stand trial is whether he possessed sufficient ability at the pertinent time to consult with his lawyer with a reasonable degree of rational understanding, and whether he has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402 (1960). A determination of incompetency to proceed stays the prosecution for as long as the incapacity persists. 50 P.S. § 7403(b).

When there is reason to doubt a defendant's competency, the trial court is required to conduct a competency hearing. *Commonwealth v. Uderra*, 862 A.2d 74, 88 (Pa. 2004). A defendant is presumed competent to stand trial, and the defendant has the burden of establishing incompetency by a preponderance of the evidence. *Commonwealth v. duPont*, 681 A.2d 1328,

4

1330 (Pa. 1996); 50 P.S. § 7403(a). At the hearing, either party may summon a psychiatrist, licensed psychologist, or other expert to testify and offer an opinion on the defendant's mental condition. 50 P.S. § 7404(b). Incompetency may be shown by psychiatric testimony based on a personal examination of the defendant. *Commonwealth v. Tyson*, 402 A.2d 995, 997 (Pa. 1979). The examination should be conducted sufficiently close in time to the proceeding to make it relevant. *Commonwealth v. Hunt*, 393 A.2d 686, 690-91 (Pa. Super. 1978).

However, the judge may reject expert psychiatric testimony of insanity. *Commonwealth v. Tempest*, 437 A.2d 952, 954 (Pa. 1981). Furthermore, a person may be competent to stand trial even though he has a history of mental illness. *Commonwealth v. Pifer*, 425 A.2d 757, 760 (Pa. Super. 1981). A mental disorder must interfere with the ability of the defendant to understand the proceedings or assist counsel before it is sufficient to constitute incompetence. *Commonwealth v. Martinez*, 446 A.2d 899, 901 (Pa. 1982). In *Commonwealth v. Hughes*, 555 A.2d 1264 (Pa. 1989), the Supreme Court found that a defendant diagnosed as a schizoid personality taking medications to treat that mental disorder was insufficient in itself to establish incompetency. *Id.* at 1271. An emotionally distressed but socially functioning defendant is also competent to stand trial. *Commonwealth v. Hazur*, 539 A.2d 451, 454 (Pa. Super. 1988).

Given the sensitive nature of competency determinations, an appellate court affords great deference to the conclusions of the trial court which had the opportunity to observe the defendant personally. *Commonwealth v. Stevenson*, 64 A.3d 715, 720 (Pa. Super. 2013). The competency determination rests in the sound discretion of the trial judge, and it will not be disturbed absent clear abuse. *Commonwealth v. Hart*, 460 A.2d 745, 747 (Pa. 1983). "A finding of competency. . . . will not be reversed unless it is unsupported by the record." *Tyson*, 402 A.2d at 997.

5

At the competency hearing held on September 6, 2017, Appellant presented the testimony of Dr. Robert Stein ("Stein"), a licensed psychologist, who was accepted by the court as an expert in the field of forensic assessments qualified to determine competency to stand trial. (N.T.C. at 9-16). Stein performed a one hour evaluation of Appellant at Lancaster County Prison ("LCP") on July 26, 2017. *Id.* at 18-19. Stein noted that Appellant had a positive relationship with his attorney, he knew she was there to help him, he had no disagreements with counsel, and he correctly identified his lawyer as the person who represents his interests. *Id.* at 20-21. Although Appellant could not name the specific charges that caused him to be incarcerated, he knew it was due to aggression. *Id.* at 21. When asked about his perception of the current charges, Appellant thought the police were there to kidnap him and he reacted with aggression. *Id.* at 23. When asked if he should speak to the prosecutor without his attorney present, Appellant stated it depends because the DA interrogates both sides. *Id.* at 21-22. When asked about testifying on his own behalf, Appellant stated his attorney had instructed him not to testify and he wanted to plead guilty anyway. *Id.* at 22.

When Stein asked Appellant about the best possible outcome, Appellant replied, "time served." (N.T.C. at 22). When asked about the worst possible outcome, Appellant stated, "10 to 20 years." *Id.* When asked about the likely outcome, Appellant said, "10 to 20 years." *Id.* When asked about a prior court experience, Appellant replied that "in a prior arson case he only got six months in jail when he should have gotten five to six years." *Id.*

Stein diagnosed Appellant with "unspecified psychosis." (N.T.C. at 23). However, Stein admitted this was a "nebulous diagnosis" because he had received a very limited history. *Id.* The only medical documents he reviewed were records from 2015, when Appellant was incarcerated

6

in LCP. *Id.* at 7, 23-24, 66. Stein also relied on Appellant's self-report, current self-defeating motivation, and behavior as reported by police in this and prior offenses. *Id.* at 66. Stein further determined that Appellant was not competent to stand trial because Appellant did not know the role of the jury, he indicated God was in charge of the court, Jesus was in charge of sentencing, and justice was responsible for prosecuting the case. *Id.* at 21.[5] Furthermore, Appellant did not know the name of his attorney and he indicated he had met her twice for 15 minutes, while the attorney reported it was for over one hour. *Id.* at 20.[6]

To support his conclusions, Stein cited the inconsistency of Appellant waiving his preliminary hearing and wishing to plead guilty to a maximum sentence, while at the same time insisting he was acting in self-defense and did nothing wrong. (N.T.C. at 25-26, 59). Stein noted that Appellant also had difficulty describing the roles of various members of the court, and he had a "distorted view of best and worst outcomes." *Id.* at 25. As such, Stein believed Appellant was acting against his own interests, he could not constructively consult with counsel for his benefit, and Appellant was unable to participate or assist in his defense. *Id.* at 26, 59.

On cross-examination, Stein acknowledged that Appellant was cooperative, lucid, and oriented during the interview. (N.T.C. at 29-30).[7] Appellant was able to understand and answer

---

[5] Stein testified that Appellant did not meet the criteria for schizophrenia, there was no evidence of "frank delusions or hallucinations that significantly interfere with day-to-day function," and there was insufficient information available to make a diagnosis of bipolar disorder. (N.T.C. at 24). But Stein noted Appellant may be suffering from the delusion of "hyperreligiosity" based on answers he gave referring to God and Jesus as decision-makers in the court system. *Id.* Stein did not believe it was likely that further psychiatric treatment would ever restore competency to Appellant. *Id.* at 27-28.

[6] When questioned about the discrepancy regarding the amount of time Appellant spent with his attorney, Stein stated he did not know who was correct. (N.T.C. at 30).

[7] Stein initially testified that the interview occurred more than one year after the arrest, before admitting he made a mistake and the interview was three months after the incident. (N.T.C. at 69-71).

7

all of Stein's questions through the use of an interpreter. *Id.* at 29. Stein admitted the medical records he relied upon were "sketchy" when he stated, "[t]here's a little bit there, but not a lot. But yes, there was not a lot to rely on here." *Id.* at 57. Appellant was not tested. *Id.* at 19, 58.

While a significant factor in Stein's opinion on competency was his belief that Appellant had a distorted view of best outcomes, he later agreed that a minimum sentence of time served as expressed by Appellant was very rational and would be a best outcome. (N.T.C. at 33-34). Although Stein also believed Appellant was not competent in part because he had a distorted view of worst outcomes, Stein admitted he did not even know the maximum sentence for a first degree felony as charged in this case, while Appellant did. *Id.* at 25, 34.

Stein questioned Appellant's competency because Appellant wanted to plead guilty to a maximum sentence of 10-20 years in jail, while claiming he was acting in self-defense. (N.T.C. at 59-60). However, when the prosecutor noted the maximum sentence for two first degree felony convictions could be 20-40 years in jail if imposed consecutively, Stein admitted it would not be irrational for Appellant to accept an offer of 10-20 years in jail. *Id.* at 59-61.

The prosecutor pointed out that Appellant provided accurate and detailed information about a prior arson conviction, and recognized he was looking at a lengthy prison sentence that was reduced to only six months. (N.T.C. at 44-45). Stein admitted it would have been relevant to confirm whether this information was accurate, yet he failed to do so. *Id.* at 45.[8] Stein did not

---

[8] When Appellant appeared for a PV hearing on May 15, 2017, he properly acknowledged a prior PV where he "spit on somebody in the face." (N.T.PV. at 4-5). Appellant explained he remained incarcerated beyond the minimum sentence on the prior PV when "they left me there for six extra months because I didn't have a home plan. I was homeless." *Id.* at 8. Later in the hearing, Appellant asked the court to revoke his probation and send him to state prison, "because the County doesn't have anything good. It's bad." *Id.* Appellant later stated, "I understand that you are my lawyer and want to help me, but - - and him. I understand that you want to help me, but it's my decision." *Id.* at 12.

8

take issue with Appellant's response when asked about the charges, because Appellant gave a correct answer of "aggression" which was consistent with competency. *Id.* at 43-44. Appellant told Stein he had contact with officers, he was aggressive, and he assaulted them. *Id.* at 47-48. While Appellant said he was acting in self-defense because he believed he was being kidnapped by police, Stein was aware that Appellant may have used a drug before this incident, and the drug could have contributed to Appellant's belief rather than a psychotic disorder. *Id.* at 54, 68-69.

Stein also stated Appellant was not competent to stand trial because he had a poor factual understanding of courtroom proceedings, as evidenced by his belief that God is in charge of the court and Jesus is responsible for sentencing. (N.T.C. at 48-49). However, Stein never asked Appellant if he understood the role of a judge, including the judge who imposed sentence when he was previously in court. *Id.* at 49-50. When Appellant stated "justice" was responsible for prosecuting the case, Stein did not ask any follow-up questions. *Id.* at 50-51. When Appellant stated his only choice was to plead guilty, Stein did not go into details about a trial. *Id.* at 64. Appellant understood the role of a prosecutor as one who interrogates both sides and he showed an understanding of the process when he stated his attorney told him not to testify. *Id.* at 51-53.[9]

After careful consideration of all testimony presented during the competency hearing, the court found that Appellant had failed to meet his burden of establishing he was not competent to stand trial. (N.T.C. at 81-82). Thereafter, on September 27, 2017, Appellant was found guilty following a jury trial. (N.T. at 523). Appellant appeared for sentencing on October 4, 2017, at which time defense counsel submitted a mitigating report prepared by psychiatrist Dr. Jerome

---

[9] While Stein stated that Appellant did not understand the role of a jury, defense counsel did not believe that Appellant ever had a jury trial when he previously appeared in court. (N.T.C. at 77-78).

9

Gottlieb. (N.T.S. at 4). Dr. Gottlieb evaluated Appellant at LCP on September 18, 2017, only twelve days after the competency hearing and seven days before trial. *Id.* at 24; *see also* Gottlieb report, 9/29/17 at 6. In his report, Dr. Gottlieb wrote, "during the time that [Appellant] refused to take his medication during his current incarceration, there was concern that he was so ill that he may not have been competent to proceed. By the time this evaluator saw him, he was back on medication and apparently had improved." *Id.*[10]

The trial court properly concluded that Appellant was competent to stand trial, and this determination was supported by Dr. Gottlieb, who noted that Appellant's competence to stand trial was not an issue as of September 18, 2017. Therefore, this claim should be dismissed.

## II. Did the Trial Court Err in Permitting an EMT to Testify as to the Effects of K2?

Appellant next asserts the trial court erred by permitting an EMT to testify to the effects of K2 when the EMT was not qualified as an expert witness, the evidence was not proper testimony of a lay witness, and it was not relevant where the EMT did not observe Appellant's interactions with police at the park. *See* Statement.

---

[10] At sentencing, defense counsel cited this portion of Dr. Gottlieb's report to bolster her argument that Appellant is amenable to rehabilitation, because he had begun taking his medications between the time of the competency evaluation and Dr. Gottlieb's evaluation. (N.T.S. at 23). However, counsel would not concede that this evaluation, which was conducted by a psychiatrist much closer in time to trial, showed that Appellant was thereby competent to stand trial. *Id.* Counsel also questioned Appellant's competency by claiming he had "several outbursts" at trial. *Id.* However, there was only one outburst when Appellant interrupted the testimony of a police officer and stated, "[s]he's bad. She's bad. You lying." (N.T. at 115-16). Appellant was told he would be removed from the courtroom if there were any further outbursts, and he stated he understood. *Id.* at 116. Appellant was told he would have an opportunity to testify and dispute the testimony of the officer, and again Appellant stated he understood. *Id.* When asked whether he had any questions, Appellant responded, "[s]he was telling lies. That's why I said." *Id.* at 116-17. Appellant then apologized and said, "[t]his is the first time I've been in a trial like this. I'm not sure how to act." *Id.* at 117. Appellant conducted himself appropriately throughout the remainder of the trial. *See* Transcript, generally. The court also conducted a colloquy with Appellant before he testified, Appellant gave appropriate responses, and he then gave very coherent testimony about the incident in response to questions asked by his attorney. *Id.* at 376-418.

10

Appellant testified that he was sitting under a pavilion in Farnum Park on the day of this incident reading a book when a male police officer approached and kicked him. (N.T. at 386-89). Without provocation, the officer hit Appellant against the wall, breaking his nose and tooth. *Id.* at 393. The officer also threw Appellant to the ground, kicking and punching him. *Id.* at 394. The female officer then began assaulting Appellant, and Appellant believed he had to fight to defend himself. *Id.* at 395. Appellant denied stabbing any of the officers with a pen during the fight, and further stated he complied with everything that was asked by the officer. *Id.* at 391.

On cross-examination, the prosecutor questioned Appellant's recollection of the events by asking whether he was using synthetic marijuana, or K2, while under the pavilion. (N.T. at 397-99, 403-04). Although Appellant admitted using K2 in the past, he denied using K2 on the day of this incident. *Id.* at 404-05. Appellant recalled being asked by emergency medical personnel whether he had been taking any drugs that day, and he told them, "no." *Id.* at 417-18.

Following Appellant's testimony, the prosecutor offered rebuttal testimony from an EMT regarding her interaction with Appellant on the day in question, including Appellant's admission to her that he used K2 that day. (N.T. at 424-25). Counsel acknowledged the EMT's testimony about Appellant's admission of K2 use would be admissible for purposes of impeachment and credibility. *Id.* at 427-28. The prosecutor also proffered that while the EMT would not opine as to whether Appellant was under the influence of K2, she would testify in general terms from her experience about the effects of K2 to show Appellant's conduct may be consistent with the use of K2. *Id.* at 425-28.[11] Defense counsel objected, stating there was no evidence in the

---

[11] Immediately prior to trial, Appellant filed a motion in limine seeking to preclude lay opinion testimony from a police officer that Appellant was under the influence of an illicit substance, citing the case of *Commonwealth v. Gause*, 164 A.3d 532 (Pa. Super. 2017). In *Gause*, an officer testifying as a lay

11

Commonwealth's case-in-chief to show that Appellant was using drugs that day, it would be improper lay testimony, and it was irrelevant. *Id.* at 426. The objection was overruled.[12]

During her testimony, Emma Einwechter stated she started volunteering as an EMT four years ago and she has been employed as an EMT for two years. (N.T. at 439). Einwechter responds to calls, treats patients, and transports them. *Id.* Einwechter has dealt with individuals who have ingested K2, and she has seen the effects of K2 on those individuals. *Id.* at 444. Some people are very sedate with respiratory depression, while many individuals are extremely violent and need to be chemically or physically sedated. *Id.* Those who become violent typically scream, hyperventilate, and try to physically assault EMTs and police. *Id.* at 445.

On the date of this incident, Einwechter was dispatched to Farnum Park for a traumatic injury. (N.T. at 440). When she arrived, Einwechter was told to go to the police station to evaluate Appellant. *Id.* Einwechter arrived at the police station at 12:50 p.m., and observed that Appellant was conscious, he was uncooperative, and he had to be dragged to a stretcher because he would not walk on his own. *Id.* at 441-42, 448. Appellant's legs were then placed in restraints on a stretcher because of his uncooperative behavior. *Id.* at 443. Einwechter asked Appellant if he had done any drugs that day, and Appellant said he used K2. *Id.* at 443-44.

---

witness opined that the defendant was under the influence of a controlled substance, and the Superior Court stated an expert is required to render an opinion about the effects of marijuana on an individual unless the circumstances are so telling of recent marijuana use that a clear connection can be made between its use and impairment. *Id.* at 537. The prosecutor agreed to the motion. (N.T. at 20-26).

[12]  There was direct evidence in the Commonwealth's case-in-chief to infer that Appellant was using drugs under the pavilion at the time of the incident. At trial, Officer Codi Herr testified that when she approached Appellant, she observed three small clear plastic baggies typically used by drug users. (N.T. at 107). Officer Michael Deitz also testified that he saw drug paraphernalia in the area where Appellant was located under the pavilion. *Id.* at 217-18, 253. Based on Appellant's denial of drug use, the court found there was probative value that would outweigh any prejudice. *Id.* at 428-29.

12

The admissibility of evidence is within the sound discretion of the trial court, and to reverse a trial court's decision the defendant must sustain the "heavy burden" of showing the trial court abused its discretion. *Commonwealth v. Bryant*, 67 A.3d 716, 726 (Pa. 2013). A finding of abuse of discretion may not be made "merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Sherwood*, 982 A.2d 483, 495 (Pa. 2009). When reviewing a trial court's ruling, the standard is one of deference. *Commonwealth v. Belknap*, 105 A.3d 7, 9 (Pa. Super. 2014).

Appellant has failed to show that the court's ruling was clearly erroneous or based on manifest unreasonableness, partiality, prejudice, bias, or ill-will. "[Q]uestions pertaining to the use of drugs or alcohol are proper when asked for the purpose of attacking the credibility of the witness by showing that at the time of the event to which he testified his powers of observation and memory were impaired, so that his recollection and account of the experience might be inaccurate." *Commonwealth v. Duffy*, 353 A.2d 50, 57 (Pa. Super. 1975)). A witness's drug use and physical condition after consuming drugs is a matter of credibility to be determined by the jury. *Commonwealth v. Hudson*, 414 A.2d 1381, 1385 (Pa. 1980).

Furthermore, while Appellant argues there was no evidence in the Commonwealth's case-in-chief to show he was using drugs that day, testimony established that baggies typically possessed by drug users were found in close proximity to Appellant. Appellant also admitted to the EMT that he used K2 that day. While Appellant argues the testimony was not relevant where the EMT did not observe Appellant's interactions with police at the park, the EMT personally

13

interacted with Appellant only thirteen minutes after he was removed from the park.[13] The EMT did not offer an expert or lay opinion as to whether Appellant was under the influence of K2. Rather, she testified to her observations of Appellant and her prior experience with individuals who used K2, so the jury could draw their own conclusion as it related to witness credibility.

Assuming, *arguendo*, the testimony was improperly admitted, an erroneous ruling on an evidentiary issue does not automatically entitle a defendant to relief where the error was harmless. *Commonwealth v. Yockey*, 158 A.3d 1246, 1254 (Pa. Super. 2017). Not all errors at trial entitle an appellant to a new trial, and the harmless error doctrine reflects the reality that an accused is entitled to a fair trial, but not a perfect trial. *Commonwealth v. Green*, 162 A.3d 509, 519 (Pa. Super. 2017). An error may be harmless if the properly admitted evidence of guilt was so overwhelming and the prejudicial effect so insignificant by comparison that it is clear beyond a reasonable doubt the error could not have contributed to the verdict. *Commonwealth v. Stetler*, 95 A.3d 864, 890 (Pa. Super. 2014). In *Commonwealth v. Rose*, 172 A.3d 1121 (Pa. Super. 2017), the Superior Court found it was harmless error when the trial court improperly permitted a detective to testify to the interpretation of street language as a lay witness. *Id.* at 1128-32.

In the present case, the properly admitted evidence was overwhelming and any prejudicial effect so insignificant by comparison that it is clear beyond a reasonable doubt the testimony of the EMT could not have contributed to the verdict. According to testimony from Officer Codi Herr ("Herr"), she and Officer Michael Deitz ("Deitz") were on routine patrol in Lancaster City on Sunday, April 16, 2017, when they proceeded to Farnum Park. (N.T. at 99-101). The officers

---

[13] Video footage at 12:30 p.m. shows Appellant and the officers on the ground during the assault. (N.T. at 262, 265). Footage at 12:37 p.m. shows Appellant in the custody of officers at the crime scene. *Id.* at 163. Einwechter made contact with Appellant at 12:50 p.m. *Id.* at 448.

14

encountered Appellant sleeping under a pavilion, they woke him, and asked for identification. *Id.* at 102-03. Appellant was uncooperative. *Id.* at 104-06. When Deitz began issuing a citation for camping in the park, Appellant became agitated and cursed at the officers. *Id.* at 109-10.

Herr stated that after Deitz handed the citation to Appellant, Appellant crumpled it up and loudly said "fuck you" or "fuck this." (N.T. at 113). When Appellant cursed again, Deitz told him to stand up and put his hands behind his back. *Id.* at 114. As Deitz was attempting to handcuff Appellant's wrists, Appellant turned around and punched Deitz in the face with a closed fist. *Id.* at 115. Herr "could tell by the way that this took place that this was an assault and not just resisting arrest." *Id.* at 119. Deitz was on his knees as Appellant continued to swing at him. *Id.* at 120. Herr attempted to hold Appellant back from Deitz, but she was unable to gain control because Appellant was "very strong." *Id.*

Herr jumped on Appellant's back in an attempt to gain control, but Appellant forced Herr to the concrete floor of the pavilion. (N.T. at 120). Appellant then grabbed Herr's hair so tight it felt like "all my hair was ripping out." *Id.* at 121. Appellant lifted Herr's head up and slammed it into the concrete ground multiple times. *Id.* Deitz was punching Appellant at this time, but his punches did not get Appellant to release Herr's hair. *Id.* During the assault, Appellant switched his aggression between the two officers. *Id.* at 125.

Herr testified it appeared as if Appellant "wanted to cause as much damage as possible." (N.T. at 126). He did not show any intent to flee the area. *Id.* Both officers deployed their tasers in an attempt to gain control of Appellant, but the tasers had "no effect." *Id.* at 126-27. At one point during the assault a pen fell to the ground, and Appellant's eyes "lit up at the pen" when he saw it. *Id.* at 128. Appellant grabbed the pen and lunged toward both officers. *Id.*

15

The officers eventually got Appellant on his back, and Deitz was trying to hit Appellant with a baton. (N.T. at 129). Appellant grabbed the baton and attempted to control Deitz. *Id.* Herr jumped onto Appellant and put her knee in his chest. *Id.* Blood was dripping from both officers. *Id.* Appellant's body eventually went weak and Herr believed they were going to be able to handcuff him, but the assault escalated once again. *Id.* Thereafter, Appellant was on his back in the middle of the pavilion, and Herr believed if she did not keep him down, Appellant "was going to be able to cause serious injury to us because it was a long fight." *Id.* at 130.

Herr knew if she lost control of Appellant plenty of things were possible. (N.T. at 130). This was "a potentially deadly situation." *Id.* Herr contemplated utilizing her firearm if things continued as they were, but chose not to because of the dynamics and movement throughout the assault. *Id.* at 130-31. During pauses in the assault, Herr attempted to radio backup to her location. *Id.* at 136. Eventually, additional officers arrived to assist Herr and Deitz. *Id.* at 138. Since Deitz was bleeding heavily from his face, Herr told the officers to help him first. *Id.* Herr was then transported to the hospital, where it was determined she suffered a concussion, a strained neck, an injured nose, and bumps and bruises. *Id.* at 139-40. Herr was very dizzy, nauseous, couldn't think straight, and suffered from memory issues for a while. *Id.* at 140.

According to testimony from Deitz, he and Herr were conducting a proactive patrol of Farnum Park due to past complaints about people using drugs in the park. (N.T. at 215). Deitz observed Appellant lying on the ground with his eyes closed, shoes off, and trash and blankets underneath him. *Id.* at 217. Deitz testified to drug paraphernalia located around Appellant, including one-inch by one-inch Ziploc baggies. *Id.* at 218. Deitz had encountered Appellant only two days prior to this incident, at the very same location, and informed Appellant he could

16

not sleep in the park. *Id.* at 218-19. When Deitz woke Appellant and asked him to move along, Appellant was not compliant and became aggressive, "yelling fuck, fuck you, all sorts of variations of that." *Id.* at 219-20.

Because Appellant continued to curse and raise his voice in the vicinity of several citizens in the park, Deitz advised Appellant that if he did not calm down he would be cited for disorderly conduct. (N.T. at 220). When Appellant did not comply, Deitz issued a citation. *Id.* at 220-22. Appellant crumpled up the citation and continued to curse at the officers. *Id.* Deitz told Appellant to stand up, turn around, and place his hands behind his back. *Id.* at 223-24. Appellant initially complied, but his arms tensed up and he tried to pull away. *Id.* at 224-25. Appellant then turned around and punched Deitz in the right eye with a closed fist. *Id.* at 225.

Deitz was dazed, dizzy, and fatigued by the first punch so he tried to regain his composure. (N.T. at 226-27). While Appellant could have fled at that time, he chose to re-engage with Deitz. *Id.* at 226-28. Deitz then took Appellant and himself to the ground in a bear hug. *Id.* When Appellant started to stand up, Herr jumped on his back. *Id.* Herr then ended up on the ground and Appellant started bashing her head onto the concrete floor. *Id.* Deitz grabbed Appellant and punched him as best he could. *Id.* Deitz also tased Appellant three times, but "nothing worked." *Id.*

Deitz stated his face was bleeding pretty badly and he began losing vision in his right eye because of the blood in his eyes. (N.T. at 228). Deitz had never been so fatigued in his life. *Id.* Deitz pulled Herr's ASP baton out of her duty belt and hit Appellant as much as he could, but became so fatigued his hand cramped up and the baton fell out of his hands. *Id.* at 229. Other officers eventually arrived to take Appellant into custody, and Deitz was then transported to the

17

hospital for immediate treatment. *Id.* at 245-46. Photographs of Deitz taken after the incident showed two puncture wounds near the right eye and cuts all over his face and forehead. *Id.* at 243. His eye involuntarily twitched for a couple days thereafter. *Id.* at 244.

According to testimony from Officer Todd Grager ("Grager"), he rushed to Farnum Park with lights and sirens activated when he heard an alert over the radio indicating an officer was calling with an emergency. (N.T. at 288-89, 292-93). When he arrived at the park, Grager immediately saw that Deitz's face was extremely bloody. *Id.* at 293. Grager also saw Herr "riding onto a subject, just holding on trying to control him." *Id.* at 293-94. The scene indicated this "was a very active fight," with taser cartridges, expanded ASP batons, radios, and taser wires all over the ground. *Id.* at 294. Herr told Grager that the subject she was trying to hold down had stabbed Deitz. *Id.* Grager then struck Appellant multiple times on the head and applied pressure with his right knee into the left side of Appellant's head. *Id.* at 297. Eventually, with the help of three additional officers, Grager was able to take Appellant into custody. *Id.* In total, the assault on the officers lasted for at least seven and one half minutes. *Id.* at 211-12.

In the present case, the court did not err by admitting the testimony of the EMT. If there was error, it was harmless because it is clear beyond a reasonable doubt the error could not have contributed to the verdict. The properly admitted evidence of guilt was overwhelming, and any prejudicial effect was insignificant by comparison. Therefore, this claim should be denied.

### III. Did the Trial Court Err by Instructing the Jury on How to Consider the EMT's Testimony Regarding Appellant's Statements of K2 Use?

Appellant further claims the trial court erred by instructing the jury that it could consider the EMT's testimony regarding Appellant's statement of K2 use for the truth of the matter

18

asserted rather than solely for impeachment purposes, where the statement was offered in rebuttal and should not have been considered for its truth. *See* Statement.

Prior to rebuttal testimony from the EMT, the court informed counsel the jury would be instructed that Appellant's statement of K2 use to the EMT was admissible for impeachment purposes only. (N.T. at 424-28, 431). Defense counsel agreed, while vaguely objecting to "[a]nything further than that." *Id.* at 428. Following rebuttal testimony from the EMT, the court informed counsel that the jury would be instructed they may consider Appellant's statement to the EMT for impeachment purposes and for the truth of the matter asserted. *Id.* at 494. The Commonwealth agreed. *Id.* at 495. Defense counsel did not object, but rather stated:

> COUNSEL: Just for the record, Your Honor, our position would be that the testimony of the EMT with respect to any prior statements made by Mr. Sanchez-Padilla would be impeachment only and that that should be the instruction.
>
> COURT: Okay. But would that not be a statement by a party opponent that would be admissible for that purpose, as well?
>
> COUNSEL: Your Honor, my understanding is that it was impeachment, and that's my position for the record.

*Id.* The court later instructed the jury that the may consider the statement allegedly made to the EMT as proof of the truth of anything Appellant said in the earlier statement to the EMT, and to help them judge the credibility and weight of Appellant's trial testimony. *Id.* at 502. Following this instruction, counsel did not object. *Id.* at 518. When asked at the conclusion of the jury instructions whether she had any exceptions to the charge, counsel replied that she did not. *Id.*

"A specific and timely objection must be made to preserve a challenge to a particular jury instruction." *Commonwealth v. Moury*, 992 A.2d 162, 178 (Pa. Super. 2010). "Failure to do so

19

results in waiver." *Id.* In *Rose, supra*, where the defendant's objection at trial was a "bald objection without specificity," the Superior Court found the issue was waived. 172 A.3d at 1128. In *Moury, supra*, where the appellant did not object when the court charged the jury, and responded in the negative when the court asked if the defense wished to add anything to the jury instructions, the Superior Court concluded the appellant waived his challenge to the jury charge. 992 A.2d at 179. Generally, a defendant waives a challenge to the propriety of the jury charge on appeal if he responds in the negative when the court asks whether additions or corrections to a jury charge are necessary. *Commonwealth v. McCloskey*, 835 A.2d 801, 812 (Pa. Super. 2003). Thus, the issue is waived.

Assuming, *arguendo*, Appellant did not waive this issue, the trial court provided an accurate recitation of the law. A statement offered against an opposing party that was made by the party in an individual capacity is not excluded by the hearsay rule. Pa.R.E. 803(25). The admissibility of a party's own statement offered against the party as an exception to the hearsay rule is consistent with Pennsylvania law. *See Salvitti v. Throppe*, 23 A.2d 445 (Pa. 1942). In *Commonwealth v. Edwards*, 903 A.2d 1139 (Pa. 2006), the defendant's statement to a friend that he had robbed a victim was admissible as an admission by a party opponent. *Id.* at 1158.

Moreover, "[t]he trial court has broad discretion in phrasing its instructions, . . . so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Hawkins*, 787 A.2d 292, 301 (Pa. 2001)). "When evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial." *Id.* Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error in the giving of jury instructions. *Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa.

20

Super. 2014). Appellate courts will not rigidly inspect a jury charge and find reversible error for every technical inaccuracy, but rather evaluate whether the charge sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision. *Moury*, 992 A.2d at 178.

In the present case, the charge as a whole sufficiently and accurately apprised the jury of the law it must consider in rendering its decision. Moreover, the instruction was not prejudicial to Appellant because the statement to the EMT was not a confession relating to the criminal charges. Further, the evidence of guilt was overwhelming. Thus, this claim should be denied.

## IV. Did the Trial Court Err by Instructing the Jury on Voluntary Intoxication?

Appellant asserts the trial court erred by instructing the jury that voluntary intoxication was not a defense, where all evidence regarding Appellant's alleged voluntary intoxication came from the prosecution on rebuttal and it would not have been in evidence at all but for the prosecutor's choice to place it into evidence. *See* Statement.

After Appellant testified, the prosecutor asked the court to instruct the jury that voluntary intoxication is no defense. (N.T. at 420-21). Defense counsel did not believe there was a basis for the instruction at that time, and the court agreed. *Id.* at 421. The prosecutor then indicated he would present evidence to show that Appellant used K2 that day, and the court stated it would consider giving the instruction if the testimony was provided. *Id.* at 421-22. Thereafter, defense counsel did not object. *Id.* The EMT then testified that Appellant admitted to her he had used K2. *Id.* at 443-44. The court later gave the following instruction:

> There was testimony to suggest the Defendant had used K2 or synthetic marijuana on the date of this incident. Voluntary intoxication or a drugged condition is not a defense to these criminal charges. A person who voluntarily uses intoxicants or drugs cannot become so intoxicated or drugged that he is legally incapable of committing a crime.

21

There is another related rule, and that is, the defendant is not allowed to rely on evidence of his own intoxication or drugged condition to prove that he lacked a mental state required for a particular crime. Keep this rule in mind when you are deciding whether the defendant had the intent to cause serious bodily injuries to the officers as required for aggravated assault, the intent to cause bodily injury required for simple assault, or the intent to prevent the police officers from effecting a lawful arrest or discharging any other duty necessary for resisting arrest.

*Id.* at 513. Counsel did not object following the instruction, nor when she was asked if she had any exceptions. *Id.* at 518. Because a specific and timely objection was not made, a challenge to the jury instruction is waived. *Olsen*, 82 A.3d at 1050.

Assuming, *arguendo*, Appellant did not waive the issue, "[t]he trial court has broad discretion in phrasing its instructions, . . . so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Hawkins*, 787 A.2d at 301. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error in the giving of jury instructions. *Antidormi*, 84 A.3d at 754. Presently, the jury was instructed that to find Appellant guilty of aggravated assault, they must find it was "his conscious object or purpose to cause such serious bodily injury." (N.T. at 506-08). To find Appellant guilty of resisting arrest, they must find Appellant had the intent of preventing the police officer from effecting a lawful arrest or discharging any other duty. *Id.* at 512-13. The court advised the jury that, when deciding Appellant's intent, a voluntary drugged condition is not a defense. *Id.* at 513.

The charge as a whole sufficiently and accurately apprised the jury of the law it must consider in rendering its decision. While Appellant claims evidence of Appellant's voluntary intoxication would not have been in evidence but for the prosecutor's choice to place it into evidence, the prosecutor did not place it into evidence until after Appellant testified and denied using K2 that day. Further, as one of the elements of aggravated assault and resisting arrest, the

22

Commonwealth was required to prove Appellant acted with intent. The Commonwealth had a legitimate concern that the jury could find Appellant not guilty if they found he could not form the specific intent due to a voluntary drugged condition. The instruction was in accordance with the law and it was appropriate given the circumstances. Therefore, this claim should be denied.

**V.    Did the Trial Court Err by Finding that the Deadly Weapon Enhancement Applied?**

At sentencing, the Commonwealth provided a sentencing guideline worksheet which applied the deadly weapon used enhancement to all three counts, because Appellant used a pen to attack the officers during the assault and while resisting arrest. (N.T.S. at 13); *see* Sentencing Guidelines Worksheet. Appellant objected, claiming a pen does not qualify as a deadly weapon. (N.T.S. at 8-9). The court disagreed, finding the enhancement was applicable based on the manner in which Appellant used the pen during the incident. *Id.* at 15-16.

Appellant now argues the trial court erred by finding the deadly weapon enhancement applied because there was no evidence to show that Appellant used a pen to attack either officer, the pen did not fit the definition of a deadly weapon, and it was not used as a deadly weapon. *See* Statement. Further, even if it was used as a deadly weapon, an enhancement would not apply for the assault of Officer Herr because the pen was used only in the assault of Officer Deitz. *Id.*[14]

At trial, Officer Herr testified that during their struggle, Appellant saw a pen and "his eyes, they lit up at the pen." (N.T. at 128). Herr screamed to Appellant, "no, don't grab the pen, don't grab the pen." *Id.* Appellant continued to crawl towards the pen, while Herr tried to stop

---

[14] At sentencing, the Commonwealth suggested the concrete floor could be a deadly weapon because Appellant repeatedly struck Officer Herr's head onto the concrete. (N.T.S. at 14-15). In his Statement, Appellant argues the concrete floor is not a deadly weapon. *See* Statement. The trial court agreed, and did not consider the concrete floor to be a deadly weapon. (N.T.S. at 15-16).

23

him. *Id.* Appellant then grabbed the pen and lunged towards Deitz. *Id.* According to Herr, Appellant "did attempt to, and I don't remember if he made contact, but he lunged toward Officer Deitz's leg at least twice." *Id.* When reviewing Commonwealth exhibits, Herr testified, "[i]n Slide 12, you'll see half of the pen that was used by the defendant to try and stab [Officer Deitz]." *Id.* at 147-48.

On redirect, Herr again testified that when Appellant saw the pen his eyes opened wide, and "[h]e picked the pen up like so, and when he attempted to stab Officer Deitz in the leg, he went like this twice [indicating]." (N.T. at 212). Appellant maintained the pen in his hand and continued to attempt to stab Deitz with the pen as Herr yelled at him not to stab Deitz. *Id.* at 213. In fact, Herr testified "[i]t was like my yelling made him want to do so more." *Id.* The pen eventually broke, although Herr did not see what caused the pen to break. *Id.*

Officer Benjamin Rothermel, one of the officers who responded to assist, testified:

> I didn't know in that moment if there was a knife. I assumed there was a knife. I found out later that was not the fact. But at that moment, I heard, he stabbed Deitz, and based on the blood that I saw on her face and the blood I saw on Deitz's face and that he rolled out of the fight right away, he was that exhausted and hurt, I assumed at that point that there was a knife in the mix.

(N.T. at 317). Photographs of Deitz taken after the incident showed two puncture wounds near the right eye and cuts all over his face. *Id.* at 243. Lieutenant Philip Berkheiser, the affiant in this case, also testified that "[t]he injuries on Officer Deitz's face are consistent with being stabbed in the face multiple times with a sharp instrument." *Id.* at 361.

The sentencing guidelines provide for a higher range of recommended sentences when specific facts which trigger enhancements are present. 204 Pa. Code § 303.9(b). One such enhancement applies when the offender possesses or uses a deadly weapon. 204 Pa. Code §

24

303.10. The relevant section of the deadly weapon enhancement reads as follows:

> (2) When the court determines that the offender used a deadly weapon during the commission of the current conviction offense, the court shall consider the DWE/Used Matrix (§ 303.17(b)). An offender has used a deadly weapon if any of the following were employed by the offender in a way that threatened or injured another individual:
>
> (iii) Any device, implement, or instrumentality capable of producing death or serious bodily injury.

204 Pa. Code § 303.10(a)(2)(iii). The deadly weapon enhancement applies to each conviction offense for which a deadly weapon is possessed or used. 204 Pa. Code § 303.10(a)(4).

Appellant argues the trial court erred by finding the deadly weapon enhancement applied because there was no evidence to show that Appellant used the pen as a deadly weapon to attack either officer. However, the testimony clearly established that Appellant used a pen as a deadly weapon to attack and stab the officers.

Appellant also argues a pen does not fit the definition of a deadly weapon. However, in *Commonwealth v. Solomon*, 151 A.3d 672 (Pa. Super. 2016), the Superior Court held that items not normally considered deadly weapons can take on such status based on their use under the circumstances. *Id.* at 677. In this case, Appellant intentionally used a pen in an attempt to stab Officer Deitz, and Deitz sustained puncture wounds near the eye that were consistent with punctures from the pen. Clearly, that pen was capable of producing serious bodily injury or blindness if Appellant had stabbed Officer Deitz in the eye.[15]

---

[15] In *Commonwealth v. Cedeno*, 2016 WL 1615578 (Pa. Super. 2016), where the defense suggested a pen used in a stabbing was not a deadly weapon capable of seriously injuring the victim, the trial court did not abuse its discretion by denying appellant's weight of the evidence claim. *Id.* at *5-6. In *Commonwealth v. Alexander*, 2016 WL 4937790 (Pa. Super. 2016), the Superior Court found the Commonwealth presented sufficient evidence to support the appellant's first-degree murder conviction where the defendant used a pen on a vital part of the victim's body. *Id.* at *3-4. While these cases are not precedential, they are offered for their persuasive value.

25

Appellant further argues that even if a pen was used as a deadly weapon, an enhancement would not apply for the assault of Officer Herr because the pen was used only in the assault of Officer Deitz. However, in *Commonwealth v. Tavarez*, 174 A.3d 7 (Pa. Super. 2017), the Superior Court held that to establish use of a deadly weapon under this provision, the record must show that while committing a particular offense, the defendant used the weapon to threaten or injure the victim. *Id.* at 11. Here Appellant used a pen as a deadly weapon while assaulting both officers. Although he may not have injured Officer Herr with the pen, he certainly used the pen to threaten Officer Herr. Therefore, the enhancement would apply to Officer Herr as well.

Because the deadly weapon used enhancement was properly applied to the sentencing guidelines, this claim should be dismissed. Assuming, *arguendo*, the deadly weapon used enhancement was not applicable to one or more of the counts, the sentences imposed were within the aggravated range of the sentencing guidelines and, as discussed *infra*, the court identified aggravating circumstances warranting such a departure.

## VI. Did the Trial Court Err by Imposing a Manifestly Excessive Aggregate Sentence?

Appellant claims the aggregate sentence imposed was manifestly excessive, an abuse of the court's discretion, and the court did not give appropriate consideration to mitigating circumstances. *See* Statement. Appellant suggests his mental illness should have been treated as a mitigating circumstance, particularly where he had not been offered drug treatment in a dual diagnosis facility. *Id.* He also argues the court failed to consider "the fact that the injuries to the officers were minor," and erred in finding that this was a brutal attack. *Id.*

A defendant's right to appeal the discretionary aspects of his sentence is not absolute, and before such a challenge will be heard two requirements must be met. *Commonwealth v. Fiascki,*

26

886 A.2d 261, 263 (Pa. Super. 2005). First, an appellant must set forth a concise statement of the reasons relied upon for allowance of appeal with regard to discretionary aspects of a sentence. *Id.*; Pa.R.A.P. 2119(f). In the present case, Appellant has timely filed a Statement which sets forth the reasons relied upon for allowance of appeal with respect to the discretionary aspect of his sentence. *See* Statement. Therefore, the court will presume for purposes of this appeal that Appellant will likewise satisfy the requirements of Pa.R.A.P. 2119(f) by filing a separate concise statement with the Superior Court of Pennsylvania.

Second, an appellant must show there is "a substantial question that the sentence imposed is not appropriate under the Sentencing Code." *Commonwealth v. Bishop*, 831 A.2d 656, 660 (Pa. Super. 2003)); 42 Pa.C.S.A. § 9781(b). To establish the existence of a substantial question, an appellant must show that the actions taken by the sentencing court are inconsistent with the sentencing code, contrary to the fundamental norms that underlie the sentencing process, or violate application of the sentencing guidelines. *Fiascki*, 886 A.2d at 263-64. That is, "a party must articulate reasons why a particular sentence raises doubts that the trial court did not properly consider [the] general guidelines provided by the legislature." *Commonwealth v. Mouzon*, 812 A.2d 617, 622 (Pa. 2002) (quoting *Commonwealth v. Koehler*, 737 A.2d 225, 244 (Pa. 1999)). "A bald allegation of excessiveness will not suffice" to establish a substantial question. *Fiascki*, 886 A.2d at 263.

As to the second requirement, Appellant asserts the court did not give appropriate consideration to mitigating circumstances. When a sentence falls within the standard range of the sentencing guidelines, a claim of inadequate consideration of mitigating factors does not raise a substantial question for review. *Commonwealth v. Matroni*, 923 A.2d 444, 455 (Pa. Super.

2007). However, a claim that the court erred by imposing an aggravated range sentence, without considering mitigating circumstances, does raise a substantial question. *Commonwealth v. Felmlee*, 828 A.2d 1105, 1107 (Pa. Super. 2003). In this case, the court imposed an aggravated range sentence if the deadly weapon enhancement did not apply. Appellant also alleges the court erroneously applied the deadly weapon enhancement. A substantial question is raised "where an appellant alleges his sentence is excessive due to the sentencing court's error in applying the deadly weapon enhancement." *Commonwealth v. Phillips*, 946 A.2d 103, 112 (Pa. Super. 2008). Therefore, the court will address Appellant's claim on the merits.

When determining an appropriate sentence, the court is required to consider a defendant's character, prior criminal record, age, personal characteristics, potential for rehabilitation, and particular circumstances of the offense. *Commonwealth v. Hyland*, 875 A.2d 1175, 1184 (Pa. Super. 2005). The goal of the sentencing code is to ensure that "'the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.'" *Mouzon*, 812 A.2d at 620 (quoting 42 Pa.C.S.A. § 9721(b)).

The general standard of review when considering a challenge to the discretionary aspects of a court's sentence has been established by the Superior Court as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Rodda*, 723 A.2d 212, 214 (Pa. Super. 1999)). In discussing the rationale

28

behind such broad discretion to the sentencing court and the deferential standard of appellate review, the Pennsylvania Supreme Court has stated:

> [T]he sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. . . . Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed. Even with the advent of the sentencing guidelines, the power of sentencing is a function to be performed by the sentencing court.

*Commonwealth v. Walls*, 926 A.2d 957, 961-62 (Pa. 2007). The Supreme Court noted that the sentencing court is in a superior position to "'view the defendant's character, displays of remorse, defiance or indifference and the overall effect and nature of the crime.'" *Id.* at 961 (quoting *Commonwealth v. Jones*, 613 A.2d 587, 591 (Pa. Super. 1992)).

When reviewing a challenge to discretionary aspects of a sentence, the appellate court should affirm the trial court's sentence unless it finds: "(1) that the guidelines were erroneously applied; (2) that the sentence, even though within the guidelines, is 'clearly unreasonable'; or (3) that the sentence, if outside the guidelines, is 'unreasonable.'" *Fiascki*, 886 A.2d at 263; 42 Pa.C.S.A. § 9781(c). To determine if a sentence is unreasonable, courts must consider the circumstances of the offense, background and characteristics of the defendant, opportunity of the trial court to observe the defendant, the trial court's review of any pre-sentence investigation, findings upon which the sentence was based, and sentencing guidelines promulgated by the Sentencing Commission. *Commonwealth v. Moore*, 617 A.2d 8, 12 (Pa. Super. 1992); 42 Pa.C.S.A. § 9781(d). In *Walls, supra*, the Supreme Court declined to define unreasonableness, but did state "we are confident that rejection of a sentencing court's imposition of sentence on

29

unreasonableness grounds would occur infrequently . . . especially when the unreasonableness inquiry is conducted using the proper standard of review." *Walls*, 926 A.2d at 964.

As to sentencing guidelines, the Supreme Court stated:

> the guidelines have no binding effect, create no presumption in sentencing, and do not predominate over other sentencing factors - they are advisory guideposts that are valuable, may provide an essential starting point, and that must be respected and considered; they recommend, however, rather than require a particular sentence.

*Walls*, 926 A.2d at 964-65. There is no requirement that courts sentence to the minimum confinement. *Id.* at 965. Rather, "trial courts retain broad discretion in sentencing matters, and therefore, may sentence defendants outside the Guidelines." *Mouzon*, 812 A.2d at 621. The guidelines are merely one factor among many for the court to consider when imposing a sentence of incarceration; the only requirement is that the recommended range be considered. *Commonwealth v. Sessoms*, 532 A.2d 775, 781 (Pa. 1987).

If the sentencing court takes into consideration information contained within a pre-sentence investigation report, the Superior Court has noted:

> Since the sentencing court had and considered a presentence report, this fact alone was adequate to support the sentence, and due to the court's explicit reliance on that report, we are required to presume that the court properly weighed the mitigating factors present in the case. . . where the sentencing judge had the benefit of a presentence investigation report, it will be presumed that he or she was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.

*Commonwealth v. Fowler*, 893 A.2d 758, 766-67 (Pa. Super. 2006) (quoting *Commonwealth v. Boyer*, 856 A.2d 149, 154 (Pa. Super. 2004)) (citation omitted).

In the present case, a PSI report was prepared and made part of the record. (N.T.S. at 2-5). Prior to imposing sentence, the court confirmed that all information in the PSI was accurate. *Id.* The court then stated it was taking into consideration all information contained within the

30

PSI to determine the appropriate sentence, including Appellant's mental health history. *Id.* at 36.

Thus, pursuant to *Fowler*, there is a presumption that the sentencing court was aware of and properly weighed all relevant information regarding Appellant, including any mitigating factors.

Specifically, Appellant's character and history were considered by the court. (N.T.S. at 39). Appellant was 25 years of age when the new crimes and PVs occurred, an age of sufficient maturity to understand the significance of his acts. *Id.* at 38-39. Appellant also had a very limited work history. *Id.* at 39-40.

The court considered Appellant's level of education, dropping out of school after the 8th grade in San Juan, Puerto Rico, because he did not like school. (N.T.S. at 39). However, Appellant received his GED in 2011 or 2012, and there was nothing to indicate a lack of intellectual ability that would prevent him from understanding the significance of his acts. *Id.* Appellant reported he cannot read or write the English language, but the officers testified that Appellant could speak and understand the English language. *Id.* As such, there was no reason to believe that language prevented Appellant from understanding what was happening. *Id.*

The court considered Appellant's self-reported history of substance abuse. (N.T.S. at 37). Appellant stopped drinking in 2015, he began using marijuana daily at age 15, he failed to complete a drug and alcohol treatment program because he did not believe he was addicted to drugs, and he only used marijuana or synthetic marijuana recreationally. *Id.*

The court took into consideration Appellant's mental health history. (N.T.S. at 36-37). Appellant received outpatient mental health treatment in San Juan, Puerto Rico, for ADHD at the age of 16. *Id.* at 37. Appellant also stated he was diagnosed with ADHD, depression and compulsive aggression while at LCP, and he is currently prescribed medications. *Id.* Dr.

31

Stein's competency evaluation and testimony at the competency hearing were considered. *Id.* at 4, 37. But as noted, the court did not find the testimony of Dr. Stein to be compelling. *Id.* at 4.

The report of Dr. Gottleib was considered. (N.T.S. at 4, 37). However, Dr. Gottlieb was not present at trial and he did not review any trial testimony. *Id.* at 37-38. Rather, his report was based on an evaluation of Appellant and limited medical records. *Id.* Dr. Gottlieb noted that Appellant has not been compliant in taking his medications when he is not incarcerated, and asked the court to consider that as a mitigating factor. *Id.* at 38. In response, the court was concerned that based on his history, there was no reason to believe Appellant would be compliant taking his medications if he was not incarcerated, particularly since he has absolutely no support system, and Appellant becomes psychotic when he does not takes his medications. *Id.*

Appellant suggests the court erred by not considering his mental illness as a mitigating circumstance. However, in *Commonwealth v. Knox*, 165 A.3d 925 (Pa. Super. 2017), where the appellant made a similar claim, the Superior Court noted that while it was clear the appellant had mental health issues, the trial court did not abuse its discretion where there was no indication the trial court completely disregarded those circumstances when imposing sentence. *Id.* at 929-31. In *Commonwealth v. Lankford*, 164 A.3d 1250 (Pa. Super. 2017), where the appellant claimed he was entitled to mental health treatment, and the denial of such treatment in sentencing was cruel and unusual punishment, the Superior Court disagreed noting that there was nothing in the record to show the trial court or Pennsylvania Department of Corrections (DOC) deprived the appellant of access to mental health care. *Id.* at 1252-54.

As in *Knox*, this court did not disregard the circumstances of Appellant's mental health. Moreover, while Appellant avers a lesser or alternative sentence would enable him to seek

32

rehabilitative mental health treatment, the trial court has not inhibited or deprived him of access to mental health care. Rather, the court specifically made Appellant eligible for all treatment programs offered in SCI to address his drug/alcohol addiction and anger management issues, and there is no reason to believe DOC will deprive him of such treatment. (N.T.S. at 46, 48).

The court considered the nature and circumstances of the current offenses. (N.T.S. at 43-44). As police were asking Appellant to leave a park, he became disorderly and verbally abusive in the presence of families and children. *Id.* at 43. When police attempted to take him into custody, Appellant became extremely violent, causing injury to two police officers who were attempting to subdue him over a period of several minutes. *Id.* at 43-44. By their verdict, the jury found that Appellant intended to cause serious bodily injury to those officers. *Id.* at 44. When these crimes occurred, Appellant was already on court supervision for prior crimes of setting fire to a van, spitting in the face of a correctional officer, and damaging nine vehicles. *Id.*

The court noted the gravity of the new offenses and their impact on the victims and community. (N.T.S. at 44). As the court noted, an attack on law enforcement is an attack on our society and the rule of law, which cannot be tolerated. *Id.*

The court also considered Appellant's extensive prior criminal record.[16] (N.T.S. at 40-41). Appellant reported being on probation in San Juan, Puerto Rico for a robbery offense. *Id.* at 41. Since 2014, Appellant has appeared in court on six separate occasions for committing new

---

[16] On May 19, 2014, Appellant was convicted on four dockets: (1308-2014) DUI, DDS; (413-2014) identity theft, forgery, theft by deception, conspiracy; (522-2014) forgery, conspiracy, identity theft, theft by deception; (534-2014) forgery, conspiracy, identity theft, theft by deception. (N.T.S. at 40). He was convicted of criminal trespass on September 9, 2014, defiant trespass on January 26, 2015, and a park violation in February 2015. *Id.* at 40-41. On May 11, 2015, Appellant was convicted on two dockets of harassment and defiant trespass. *Id.* at 41. On February 18, 2016, he was convicted on three separate dockets of reckless burning, aggravated harassment by prisoner, and criminal mischief. *Id.*

crimes in twelve separate cases. *Id.* When adding PV hearings, Appellant has appeared in court on nine separate occasions in a little over three years. *Id.* at 43.

The court considered Appellant's rehabilitative needs, including the fact that there was little to indicate he has made any attempt to change his lifestyle or is amenable to rehabilitation. (N.T.S. at 41). This was Appellant's fourth overall PV since 2014. *Id.* at 6-8, 41-43. The first PV was on December 18, 2014, after Appellant failed to report for scheduled appointments with his probation officer and was charged with new crimes. *Id.* at 41-42. His second PV was on April 10, 2015, because Appellant failed to report for appointments with his probation officer. *Id.* at 42. Appellant was found in violation for the third time on September 1, 2015, because he was arrested for reckless burning only five days after he was paroled from his second violation. *Id.* Appellant was paroled directly to Nuestra Clinica on April 5, 2017. *Id.* Five days later, Appellant left that inpatient facility against staff advice, and six days thereafter he committed these new crimes, which resulted in his fourth violation. *Id.* at 42-43.

The court considered the arguments of counsel and comments made by Appellant and the victims. (N.T.S. at 38). Appellant's counsel asked for mitigated range sentences concurrent with each other based on Appellant's "irrefutable manifestation of psychotic disorder" and her belief that with treatment in SCI he could be stabilized and succeed on supervision. *Id.* at 16-20.[17] The prosecutor requested an aggravated range sentence, noting the brutality of the attack, ongoing drug use by Appellant, and testimony at the competency hearing by Dr. Stein that it was unlikely Appellant would ever be competent. *Id.* at 21-29.

---

[17] While counsel referenced the need for mental health counseling, the court noted that Appellant was paroled from his prior PV to a facility intended to help him in that regard, but he left after only five days and committed these crimes six days later. (N.T.S. at 43).

In his comments, Appellant denied using a pen and asked for the lowest possible sentence. (N.T.S. at 21). An obviously distraught Officer Deitz stated that he will live with the trauma of this event for the rest of his life. *Id.* at 29-31. Officer Herr also described how this incident impacted her life. *Id.* at 32-35.

Finally, the court considered the penalties authorized by the Pennsylvania legislature for the crimes committed, the guidelines of the Sentencing Code, and those established by the Pennsylvania Commission on Sentencing for the new criminal offenses.[18] (N.T.S. at 8-16, 38).

Based on these factors, the court found a sentence of total confinement was necessary because Appellant had clearly shown that probation was an ineffective rehabilitation tool, he is not amenable to treatment or rehabilitation outside a correctional facility, he is in need of treatment that can be provided most effectively by his commitment to an institution, Appellant's conduct indicates he is a danger to society, and he is likely to commit another crime if not incarcerated. (N.T.S. at 44-45). Furthermore, Appellant has shown a total disregard for his probation officer, law enforcement officers, this court, and the criminal justice system. *Id.* As such, a state prison sentence was essential to vindicate the authority of the court. *Id.*

Because the sentences imposed were within the standard range of the sentencing guidelines when considering the deadly weapon used enhancement, they were not manifestly excessive or an abuse of discretion. As will be discussed *infra*, even if the deadly weapon

---

[18] For aggravated assault, the offense gravity score was 10, the prior record score was 3, the standard range sentence was 42-54 months, the aggravated range sentence was up to 66 months, and the deadly weapon used enhancement was 60-72 months. (N.T.S. at 2-3; Sentencing Guidelines Worksheet). For resisting arrest, the offense gravity score was 2, the prior record score was 3, the standard range sentence was RS-4 months, the aggravated range sentence was up to 7 months, and the deadly weapon used enhancement was 6-10 months. *Id.*

35

enhancement did not apply, the court gave specific reasons to justify an aggravated range sentence.

## VII. Did the Trial Court Err by Setting Forth Improper Reasons for the Sentence Imposed?

At sentencing, the court noted that if the deadly weapon enhancement did not apply, there were aggravating circumstances to warrant a sentence in the aggravated range of the sentencing guidelines. (N.T.S. at 47). Specifically, the aggravating circumstances included the brutal attack inflicted by Appellant on the victims, the fact that this was a seven-minute assault, Appellant had several opportunities to flee during the assault but chose to stay and fight, and this was not his first assault on a law enforcement or correctional officers. *Id.* at 47-48.

Appellant asserts the court set forth improper and inadequate reasons for the aggregate sentence imposed because his prior record had already been taken into account by his prior record score and it should not have been double-counted as a basis for consecutive sentences in the aggravated range of the sentencing guidelines. *See* Statement. Appellant also claims the court improperly considered as aggravating factors his mental health condition for which he had not been taking medication,[19] and the fact that Appellant did not flee when informed he was under arrest but rather stayed and struggled with the officers. *Id.*

A sentencing court may depart from the sentencing guidelines to fashion a sentence that takes into account protection of the public, rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to impact on the community. *Commonwealth v. Warren*, 84

---

[19] The court did not consider Appellant's mental health as an aggravating circumstance. *See* N.T.S. at 47-48. In his report, Dr. Gottlieb asked the court to consider Appellant's failure to take medications when he is not incarcerated as a mitigating factor. *Id.* at 38. For the reasons previously stated, the court disagreed and noted it would warrant incarceration "for an extended period of time." *Id.*

36

A.3d 1092, 1097 (Pa. Super. 2014). A sentence above the aggravated range of the guidelines was not manifestly unreasonable where the court considered the defendant's prior criminal record, seriousness of the offense, young age of the victim, impact of the crime on the victim, the defendant's age, health, intelligence and maturity level, his work history, and his unsuccessful attempts at rehabilitation. *Commonwealth v. Crork*, 966 A.2d 585, 590-91 (Pa. Super. 2009).

In the present case, the sentencing court cited as an aggravating circumstance the brutal assault inflicted by Appellant on two law enforcement officers which lasted for approximately seven minutes. In his Statement, Appellant attempts to minimize the brutality of the attack and the injuries sustained by the officers. This court does not agree with that assessment. As the court noted at sentencing, Appellant's attack on law enforcement was an attack on our society and rule of law, which cannot be tolerated. (N.T.S. at 44).

The court also considered as an aggravating circumstance that this was not Appellant's first assault on law enforcement. Appellant was previously convicted of aggravated harassment by prisoner for spitting on a correctional officer. Appellant suggests this was improper because his prior record had already been taken into account by his prior record score. However, while factors already included in the sentencing guidelines may not be considered as the sole reason for increasing a sentence to the aggravated range, a trial court may use prior conviction history and other factors already included in the guidelines if they are used to supplement other extraneous sentencing information. *Commonwealth v. Rush*, 162 A.3d 530, 545-46 (Pa. Super. 2017).

The sentencing judge may also determine whether a sentence should run consecutive to another sentence based on the facts of a particular case. *Commonwealth v. Hill*, 66 A.3d 365, 370 (Pa. Super. 2013); *see also* 42 Pa.C.S.A. § 9721. Imposition of consecutive sentences rests

37

within the trial court's discretion. *Commonwealth v. Harvard*, 64 A.3d 690, 703 (Pa. Super. 2013). A sentencing court has discretion to not only deviate from sentencing guideline ranges, but also to run sentences consecutive to one another. *Commonwealth v. Mouzon*, 828 A.2d 1126, 1130 (Pa. Super. 2003). In *Mouzon*, consecutive sentences above the standard range of the guidelines were not manifestly excessive. *Id.* at 1130-31. The court is also free to impose a probation violation sentence consecutive to sentences for the crimes committed while on probation. *Commonwealth v. Swope*, 123 A.3d 333, 340-41 (Pa. Super. 2015). As the Superior Court noted, the appellant was "not entitled to a volume discount for his crimes." *Id.* at 341.

In the present case, consecutive sentences above the standard range of the guidelines were not manifestly excessive given the severity of the crimes committed and Appellant's very poor history of rehabilitation. Appellant was also not entitled to a volume discount for his crimes and repeated violations of probation or parole. Therefore, this claim should be dismissed.

## CONCLUSION

For the reasons stated herein, the trial court properly (1) concluded that Appellant was competent to stand trial; (2) permitted the EMT to testify to the effects of K2 or it was harmless error; (3) instructed the jury on how to consider the testimony of the EMT; (4) instructed the jury on voluntary intoxication not being a defense; (5) found that the deadly weapon enhancement applied to the offenses; (6) imposed a sentence which was not manifestly excessive or an abuse of the court's discretion; and (7) set forth proper reasons for the aggregate sentence. Therefore, this appeal should be denied.

BY THE COURT

February 5, 2018
DATE

_Donald R. Totaro_
DONALD R. TOTARO, JUDGE

Copies:    Susan E. Moyer, Esquire, Assistant District Attorney
MaryJean Glick, Esquire, Counsel for Appellant

CLERK OF COURTS
2018 FEB -5 PM 3:26
LANCASTER COUNTY, PA

39