J-S36040-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DANIEL BERT PROFFITT | : | |
| | : | |
| Appellant | : | No. 2168 EDA 2022 |

Appeal from the Judgment of Sentence Entered August 18, 2022
In the Court of Common Pleas of Chester County
Criminal Division at No(s): CP-15-CR-0000968-2019

BEFORE: BOWES, J., NICHOLS, J., and KING, J.

MEMORANDUM BY KING, J.: **FILED MAY 14, 2024**

Appellant, Daniel Bert Proffitt, appeals from the judgment of sentence entered in the Chester County Court of Common Pleas, following his jury trial convictions of guilty but mentally ill of first-degree murder and strangulation.[1] We affirm.

The relevant facts and procedural history of this case are as follows. On December 29, 2018, police responded to a 911 call placed by Appellant. When police arrived at the residence, they found Anna Johnson ("Victim") on the floor of the bathroom. Victim was pronounced dead at the scene. Police took Appellant into custody. Appellant told the officers at the scene that Victim had attacked him with a knife, and he "did what [he] had to do." (Trial Court

_____

[1] 18 Pa.C.S.A. §§ 2502(a) and 2718(a)(1); § 314(a) related.

Opinion, filed 2/22/23, at 4) (citing N.T. Trial, 6/28/21, at 80, 117). Appellant explained that he had to subdue Victim so that he could escape, after Victim had lunged at him with the knife.

The Commonwealth filed an information on March 20, 2019, charging Appellant with third-degree murder, voluntary manslaughter, criminal homicide, strangulation, eight counts of interception, disclosure or use of wire, electronic or oral communication, and two counts of criminal use of a communication facility.[2] On July 9, 2020, Appellant filed a notice of insanity defense or mental infirmity, arguing that he suffered from a delusional disorder at the time of the killing.

The case proceeded to trial and the court commenced *voir dire* on June 25, 2021. During *voir dire*, the court questioned Juror No. 3, a special agent with the FBI, who explained that she knew several state troopers who had been involved in the case, and that she had worked on a task force with two of them. Later that afternoon, Appellant requested that the court strike Juror No. 3, and the court denied the request. Appellant used his first preemptive strike on Juror No. 3, and later used all his preemptory challenges prior to empaneling of the jury.

---

[2] The Commonwealth amended the information on October 1, 2020, adding one count of first-degree murder. The Commonwealth withdrew the eight counts of interception, disclosure or use of wire, electronic or oral communication and the two counts of criminal use of communication facility prior to trial.

J-S36040-23

During trial, the Commonwealth introduced video of Appellant's statement to the police wherein he described

> the history between him and the victim, and how the victim had threatened him that day, telling him that "there [were] people on their way to kill [him], kill [his] children." (N.T. Trial, 6/30/21, at 116). Video of Appellant's statement to police and from the body cameras at the scene were played for the jury during trial.
>
> Appellant and the victim were co-tenants at the residence They both lived with the owner, Stacey Stidoms. Appellant had moved in with Ms. Stidoms after starting a romantic relationship with her. Two years later, Ms. Stidoms permitted the victim, who was an old friend, to move into the residence in December 2018 and rent a room. Appellant was not happy about the victim moving in and there was a high level of animosity between the two.
>
> Appellant explained to the jury [at trial] that his dislike for the victim was due to his working undercover to investigate local motorcycle clubs that were trafficking narcotics and weapons. The victim was known to him to be a major drug trafficker and under investigation by the DEA. As a result, she enjoyed the protection of the infamous and dangerous Pagan Motorcycle Club due to her marriage to a club member and having sons as members of the club. Appellant also testified that due to her relationship with the Pagan Motorcycle Club and her possession of a list of the DEA undercover agents, she had the power to potentially have those agents killed. Thus, he took her threats on December 29, 2018 very seriously. We note that there was no evidence, other than Appellant's testimony presented at trial, that he was working in any capacity with law enforcement or that the victim had any affiliation with a motorcycle gang.
>
> Appellant spoke with a friend on December 29, 2018, Thomas Saunders. Mr. Saunders testified that he met Appellant through mutual friends and that, although he had known of Appellant while growing up in Lancaster County, he had only gotten close to him in the past two years. In December 2018, he was in contact with Appellant on a

- 3 -

regular basis via phone or text. He was aware that Appellant had feelings of hatred, dislike, and distrust for the victim. On December 29, 2018, he spoke with Appellant over the phone earlier in the day, and he could hear the victim yelling and cussing at Appellant. He could also hear Appellant yelling and cussing back. He advised Appellant to leave the house and come visit him in Lancaster City, PA because the atmosphere in the house was not healthy for Appellant given his temper. He testified that Appellant left the house for a walk but returned around 3 p.m. when he got a second call from Appellant. Appellant seemed calmer. After that call, he received a text stating that the victim had come after Appellant with a knife.[1] (N.T. Trial, 6/29/21, at 66-74). [During Mr. Saunders' testimony, the prosecutor asked Mr. Saunders whether he had ever seen Appellant acting aggressively. The trial court overruled Appellant's objection and Mr. Saunders explained that he had seen Appellant act aggressively sometimes.]

[1] The Commonwealth presented forensic evidence to show that Appellant fabricated evidence by placing a kitchen knife next to the victim's body to justify the killing. Forensic DNA scientist Ut Dinh testified that she tested the knife's handle and blade for DNA. There was no interpretable results due to insufficient DNA in those areas. (N.T. Trial, 6/29/21, at 45, 48).

(Trial Court Opinion at 4-6) (record citation formatting provided).

In support of his claim of an insanity defense or mental infirmity, Appellant offered the testimony of Dr. Gerald Cook, a forensic psychologist who testified that Appellant met the criterial for a diagnosis of delusional disorder, and that this disorder affected Appellant's actions in killing Victim. In response, the Commonwealth called Dr. John O'Brien, also a forensic psychologist. During Dr. O'Brien's testimony, the prosecutor asked him about inconsistencies in Appellant's account of what occurred. Appellant objected to Dr. O'Brien interpreting what the physical evidence showed, and the court

overruled the objection. (N.T. Trial, 7/1/21, at 113). Later in Dr. O'Brien's testimony, the prosecutor asked him how he used photographic evidence in forming his ultimate conclusion. Appellant objected, again asserting that Dr. O'Brien's answer was commentary on his interpretation of evidence. The trial court again overruled the objection. (*Id.* at 115).

At the close of the evidence, the trial court instructed the jury on the verdict of not guilty by reason of insanity, and of guilty but mentally ill. After deliberation, the jury found Appellant guilty but mentally ill of murder of the first degree and guilty but mentally ill of strangulation. The trial court ordered a psychiatric evaluation of Appellant to be completed prior to sentencing.

On August 18, 2022, Appellant filed a motion for a new trial. The court denied the motion and proceeded to sentencing that same day. The court sentenced Appellant to life imprisonment for first degree murder and imposed a concurrent sentence of two to four years' imprisonment for strangulation. Appellant filed a timely notice of appeal on August 24, 2022. Appellant filed a *pro se* post-sentence motion on August 30, 2022, which the court denied on September 1, 2022, noting that counsel had already filed a notice of appeal at Appellant's request. Pursuant to the court's order, Appellant filed a concise statement of errors complained of on appeal on December 23, 2022.[3]

---

[3] The trial court granted several extensions of time for Appellant to file his concise statement of errors, providing newly appointed appellate counsel time to review the transcripts of the proceedings prior to submitting the concise statement.

Appellant raises the following questions on appeal:

I. Did the trial court err in not striking Juror #3 for cause?

II. Did the trial court err in overruling [his] objection to the question posed by prosecutor to Thomas Saunders, "did you ever see [Appellant] acting aggressive?"

III. After defense counsel objected to Dr. O'Brien's interpretation of what the physical evidence showed, did the trial court err in overruling objections to:

(A) Dr. O'Brien's response to inquiry regarding inconsistencies with [Appellant's] psychiatric symptoms.

(B) Dr. O'Brien's response regarding how he used the photographs in his ultimate conclusion.

IV. Did the trial court err in overruling defense counsel's objection to prosecutor's closing argument stating [Ms.] Stidoms was afraid of [Appellant]?

(Appellant's Brief at 4) (unnecessary capitalization omitted).

In his first issue, Appellant claims that the trial court erred in not striking Juror No. 3 for cause. Appellant insists that the court should have presumed a likelihood of prejudice based on Juror No. 3's close relationship with several police officers who were involved in the case, particularly where Juror No. 3 worked other investigations with State Police Corporal Robert Kirby and attended several conferences with Trooper Brian McNeilly. Appellant argues that because Juror No. 3 is an FBI agent and in the business of investigating violent crimes, Juror No. 3 is accustomed to relying on other law enforcement officers in conducting his investigations. Appellant contends that Juror No. 3's familiarity with several of the troopers involved in this case created a

presumed bias in favor of the law enforcement officers. Appellant concludes that the trial court committed reversible error when it failed to strike Juror No. 3 for cause, and this Court must grant relief. We disagree.

"A criminal defendant's right to an impartial jury is explicitly granted by Article 1, Section 9 of the Pennsylvania Constitution and the Sixth Amendment to the United States Constitution. The jury selection process is crucial to the preservation of that right." *Commonwealth v. Kelly*, 134 A.3d 59, 61 (Pa.Super. 2016).

> There are two types of situations in which challenges for cause should be granted: (1) when the potential juror has such a close relationship, be it familial, financial or situational, with parties, counsel, victims, or witnesses, that the court will presume the likelihood of prejudice; and (2) when the potential juror's likelihood of prejudice is exhibited by his conduct and answers to questions at *voir dire*. In the former situation, the determination is practically one of law and as such is subject to ordinary review. In the latter situation, much depends upon the answers and demeanor of the potential juror as observed by the trial judge and therefore reversal is appropriate only in cases of palpable error.

*Id.* at 61-62 (quoting *Commonwealth v. Colon*, 299 A.2d 326, 327-28 (Pa.Super. 1972)).[4]

> A prospective juror's status as a law enforcement officer in and of itself is insufficient to require disqualification as a juror in a criminal case. *Commonwealth v. Jones*, 477 Pa. 164, [169,] 383 A.2d 874, 876 (1978) (plurality).

---

[4] Where a defendant does not exhaust his preemptory challenges, any improper refusal of a challenge for cause is harmless error. *See Kelly, supra* at 62. Here, however, Appellant exhausted his preemptory challenges prior to empaneling of the jury, so we cannot say any error was harmless.

Indeed, the likelihood of bias on the part of police officers, who have no particular relationship to the case or to the police force involved, is not so great that the court must remove the officer from the jury. *Colon*[, *supra* at 328] (holding that "an enforcement officer is capable of professional objectivity in considering the case of a defendant accused of a crime against society."). Absent any "real relationship" to the case, the removal of a law enforcement officer should depend on the sound exercise of discretion by the trial judge. *Id.*; *see also Jones*[, *supra* at 169,] 383 A.2d at 877 (stating that if a police officer does not have a "real relationship" to the case, "he must be viewed in light of the traditional test for qualifications for jurors with the same scope of appellate review.").

However, if a police officer has a "real relationship" to the case, he must automatically be excluded from serving on a criminal jury. *Jones*[, *supra* at 168, 383 A.2d at 876] (holding that sitting a juror with a "real relationship" to the case would involve such a probability that prejudice would result that it must be deemed inherently lacking in due process.).

*Kelly, supra* at 63-64 (footnotes omitted).

Instantly, during jury selection, the following discussion took place concerning Juror No. 3:

THE COURT:    Good morning, sir.

JUROR 3:        How are you?

THE COURT:    So just to follow up on your questionnaire. You are a special agent with the FBI?

JUROR 3:        Yes, ma'am.

THE COURT:    What kind of work do you do?

JUROR 3:        I spend the bulk of my career working violent crimes; counter terrorism, federal operations.

THE COURT:    Okay.  Do you think you could be fair and

impartial in this case?

JUROR 3:    Sure.

THE COURT:   You also know several of the state troopers who are on the list?

JUROR 3:    I do.

THE COURT:   Knowing them, if they testify, do you think you could be fair and impartial listening to their testimony?

JUROR 3:    Sure.  Yep.

THE COURT:   [Defense Counsel]?

[DEFENSE]:   These state troopers, have you ever worked with them, on a task force with them?

JUROR 3:    Yes.

[DEFENSE]:   Which ones?

JUROR 3:    Most notably Kirby, I worked several investigations with him.

[DEFENSE]:   When was the last time that happened?

JUROR 3:    It's been years.  But I recognized some of [the] other names, too.  I just can't put a name to a face.  I am sure we crossed paths in the last 12 or 13 years.

[DEFENSE]:   How about socially, work happy hours, conferences?

JUROR 3:    Socially, McNeilly, Brian McNeilly.

[DEFENSE]:   How do you know him?

JUROR 3:    I just attended a couple conferences with him.

[DEFENSE]:   And with your work, FBI, have you ever gotten much into undercover work?

JUROR 3:      (Nods.)

THE COURT:   Anything else?

[ADA]:        I have no questions.

THE COURT:   Okay.  Thank you.

(N.T. Trial, 6/25/21, at 32-34).  Appellant did not move to strike Juror No. 3

for cause immediately following this discussion.  At the close of *voir dire*,

however, defense counsel stated:

> I would like to revisit—I hope we have enough, but Number
> 3 was FBI.  And over lunch, I put more thought, not so much
> to law enforcement, but just his close ties to two of the
> troopers, including one he worked with.  He was on a task
> force with one of them.

(***Id.*** at 156-57).  The trial court responded that Juror No. 3 indicated he could

be fair and impartial, so the court did not strike him for cause.  Appellant then

used his first preemptory strike for Juror No. 3.

In its opinion, the trial court further explained its reasoning for declining

to strike Juror No. 3 for cause, as follows:

> We address the relationship between Prospective Juror #3
> and Cpl. Kirby first.  During trial, it was confirmed that Cpl.
> Kirby was assigned investigative duties, but did not directly
> participate in the investigation, and he was also not called
> to testify.  (N.T. Trial, 6/29/21, at 111).  The jury would not
> be making any credibility determinations related to Cpl.
> Kirby when deliberating and coming to a verdict.  Further,
> Prospective Juror #3 clearly stated that, although he was
> familiar with the names of troopers listed on the
> Commonwealth's witness list because of his work for the
> past 12 to 13 years, he only had significant contact with Cpl.
> Kirby, "years [ago]," and stated to the court that he was
> sure he could be fair and impartial.

- 10 -

(Trial Court Opinion at 9) (record citation formatting provided). In addition, the court explained that Juror No. 3 "testified that he knew Trooper Brian McNeilly socially when they attended a couple of conferences together. There was no other information obtained about the relationship." (***Id.*** at 10). Notably, Trooper McNeilly was not on the Commonwealth's witness list, nor was there any apparent connection between Trooper McNeilly and this case.

Upon review, we conclude that the record supports the trial court's determination. Here, the record does not disclose any close relationship between Juror No. 3 and any party, counsel, victim, or witness in the case that would require the court to presume a likelihood of prejudice. Furthermore, Juror No. 3's conduct and answers to questions did not demonstrate a likelihood of prejudice. ***See Jones, supra***; ***Kelly, supra***. Therefore, the trial court did not err in not striking Juror No. 3 for cause, and Appellant's first issue merits no relief.

In his second issue, Appellant contends that the trial court erred when it overruled his objection and permitted Thomas Saunders to answer the question posed by the prosecutor about whether he ever saw Appellant acting aggressively. Appellant claims that the testimony in response to that question was impermissible character evidence. Appellant argues that his general traits of having a bad temper and aggression did not constitute permissible prior bad acts evidence. Appellant asserts that the trial court abused its discretion when it permitted Mr. Saunders to answer the prosecutor's question, and this

Court must grant relief. We disagree.

Preliminarily, regarding the admission of evidence, "it is well-settled that a party must make a timely and specific objection at trial, and the failure to do so results in waiver of that issue on appeal." ***Commonwealth v. McGriff***, 160 A.3d 863, 866 (Pa.Super. 2017), *appeal denied*, 644 Pa. 372, 176 A.3d 853 (2017). ***See also*** Pa.R.E. 103(a) (stating that party may claim error in ruling to admit or exclude evidence only if party challenging admission of evidence makes timely objection and states specific ground, unless it was apparent from context).

Instantly, the Commonwealth claims that Appellant waived this issue by failing to state the specific grounds for his objection before the trial court. At trial, the following exchange occurred:

> [ADA]: This is someone that you testified that you know fairly well. Why did you characterize his behavior—or his mood as weird?
>
> [WITNESS]: Just because—it's because I was saying just how his energy has been, energy that was—the vibe that was going on. For him to be that calm was weird to me. So that is why I really encouraged him not to go back. I told him, I said, get your ride down here, where I was.
>
> [ADA]: Can you explain to the members of the jury why you were so adamant in telling him he shouldn't go back into that house?
>
> [WITNESS]: That was an environment that wasn't good for him. I mean, for me, because of my—I'm not in a position it's not a good position to be in. It's just not.
>
> [ADA]: Do you know [Appellant] to have a temper?

[WITNESS]:    Yes, he can have a temper.

[ADA]:    Did you ever see [Appellant] acting aggressive?

[DEFENSE]:    Objection.

THE COURT:    Overruled.

[ADA]:    You may answer.

[WITNESS]:    Yeah. I would say so.  Sometimes.

(N.T. Trial, 6/29/22, at 72-73).

In its opinion, the trial court explained:

Trial Counsel [made] a general objection.  Rule 103 of the Pennsylvania Rules of Evidence requires that in addition to making a timely objection, the specific grounds for the objection must be stated "unless it was apparent from the context."  A review of the context suggests that numerous objections could have been made by Trial Counsel.  In addition to a relevancy objection pursuant to Pa.R.E. 401 for the prosecutor's failure to set forth a time period, the nature of the question may support an objection for the eliciting of character evidence pursuant to Pa.R.E. 404(a)(1) and Pa.R.E. 405(b), and lay witness opinion evidence pursuant to Pa.R.E. 701.  However, no specific grounds of any kind were stated by Trial Counsel.  As a result, we submit that the non-specific objection to the question about Appellant's aggressiveness to Mr. Saunders is waived for purposes of appellate review.

(Trial Court Opinion at 11-12).

At the outset, we note that Appellant made no objection after Mr. Saunders related to the question concerning Appellant's temper, constituting waiver of any challenge to that testimony.  *See McGriff, supra*.  Regarding the question about Appellant's aggressiveness, we agree with the

Commonwealth and the trial court that Appellant also failed to preserve this evidentiary issue for our review. Appellant lodged a general, non-specific objection to the question asked. As the trial court noted, the basis for the objection was not necessarily apparent from the context because there could have been several potential bases for the objection. Thus, Appellant's second issue on appeal is waived. *See id.*[5]

In his third issue, Appellant argues that the trial court erred when it allowed Dr. O'Brien, who was qualified as an expert in forensic psychiatry, to opine on Appellant's credibility and to explain his interpretation of the evidence. Specifically, Appellant claims that the court improperly permitted Dr. O'Brien to describe inconsistencies that he saw in the evidence, which essentially conveyed to the jury his opinion that Appellant was not a credible witness. Appellant contends that Dr. O'Brien's statements that "the knife was dishwasher clean" and "the evidence indicates [Victim] barricaded herself" were inadmissible assessments of Appellant's credibility. (Appellant's Brief at

---

[5] Moreover, Appellant admitted to strangling Victim during a struggle in the bathroom. Mr. Saunders also testified, without objection, that Appellant had a temper, and that Appellant had been fighting back and forth with Victim earlier that day and Mr. Saunders suggested that Appellant leave the house. (N.T. Trial, 6/29/21, at 71, 73). On this record, even if the court had improperly admitted the testimony from Mr. Saunders concerning Appellant's aggressiveness, such admission would constitute harmless error in this case. *See Commonwealth v. Yockey*, 158 A.3d 1246 (Pa.Super. 2017), *appeal denied*, 643 Pa. 686, 174 A.3d 567 (2017) (explaining that error will be deemed harmless where appellate court concludes beyond reasonable doubt that error could not have contributed to verdict).

45). Appellant insists that this testimony was a clear encroachment on the province of the jury in assessing Appellant's credibility. Appellant concludes the court's admission of such testimony was erroneous, and this Court must grant relief. We disagree.

Our standard of review in cases involving the admission of expert testimony is well-settled: "Generally speaking, the admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion." **Commonwealth v. Watson**, 945 A.2d 174, 176 (Pa.Super. 2008) (citations omitted). "An expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice." **Id.**

Pennsylvania Rule of Evidence 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703. Further, "[i]f the expert states an opinion the expert must state the facts or data on which the opinion is based." Pa.R.E. 705; **see also** Pa.R.E. 705 Cmt. (explaining that otherwise inadmissible facts and data supporting expert opinion are considered only to explain basis for expert's opinion, not as substantive evidence).

"[T]he purpose of expert testimony is to assist in grasping complex issues not within the ordinary knowledge, intelligence and experience of the

jury." ***Commonwealth v. Mendez***, 74 A.3d 256, 262 (Pa.Super. 2013) (citation and internal quotation marks omitted). Expert testimony may not be offered to either attack or to bolster a witness's credibility, as doing so would create "an unwarranted appearance of authority in the subject of credibility," which is a decision reserved for the jury to assess. ***Id.*** (citation omitted).

Here, the following exchange occurred during Dr. O'Brien's testimony:

> [ADA]: I want to pick up where we left off. If I remember correctly we were beginning to discuss some of the inconsistencies that you mentioned in your report. Could you explain to the members of the jury what exactly you mean by the inconsistencies?
>
> [WITNESS]: There are inconsistencies between—for example, [Appellant's] report of what took place during the confrontations. My opinion, what the evidence suggests—
>
> [DEFENSE]: Objection, improper for the Doctor to comment on the interpretation of the evidence. He can't comment on conclusions of evidence.
>
> THE COURT: Sustained.
>
> [WITNESS]: Okay.
>
> THE COURT: The question again?
>
> [ADA]: Doctor, specifically, inconsistencies that [Appellant] reported to you.
>
> [WITNESS]: I tried to answer some of the ones that stand out in my mind. They are not fair game.
>
> [ADA]: Let me ask you a question, was there inconsistencies with his reporting of drug use?
>
> [WITNESS]: Absolutely. And that has been already discussed both to me and to Dr. Cook. He never reported

using amphetamines to me at all.

[ADA]:        Was there inconsistencies with his psychiatric symptoms?

[WITNESS]:   Well, he has no psychiatric symptoms.  He has a historical report of his version of what he was experiencing at the time of the offense.  And he presents that in a very embellished and also detailed manner.  The depiction of it is internally inconsistent in a sense that he talks about himself and his role in crime prevention, working with various agencies.  Various different ways in which [Victim] had been threatening and/or aggressive or attempting to be aggressive towards him.

The material indicates that she was actually barricading herself in the house.

[DEFENSE]:   Objection, Your Honor, to interpretation of what the physical evidence shows.

[ADA]:        I don't think that was an interpretation.  I think he was relaying what he read in the report.

THE COURT:   Overruled.

[ADA]:        You may answer.

[WITNESS]:   There was some sharp contrast between [Appellant's] report of what was happening and what is documented in the record as actually happening.  In addition, the crime scene photos depict an individual in the bathroom.

[DEFENSE]:   Objection, Your Honor, interpretation of the crime scene photos.

[ADA]:        Again, he was just stating what they depict. He wasn't putting an opinion on those pictures.

[DEFENSE]:   And at the end of that sentence would be his interpretation.  The jury can look at those photographs.  The jury will decide what is in the photos.  For the Doctor to describe them is his commentary.

[ADA]: What he is using them for is how to determine how these pictures align with any potential inconsistencies in the reporting from [Appellant].

[DEFENSE]: How this witness sees the evidence lined up with what [Appellant] told him is for the jury. This witness can testify to [Appellant] saying A and then later saying X. He can testify over the inconsistencies in their interview but not what the evidence is. The jury will look at the evidence.

THE COURT: I don't know. Could you ask a better question please and try to keep it narrow? I don't know what his answer is going to be. I don't know where he was going but [Defense Counsel] it is sustained.

[ADA]: Doctor you were discussing your review of the photographic evidence?

[WITNESS]: Yes.

[ADA]: And what, if anything, did the photographs or how did you use the photographs in your ultimate conclusions?

[WITNESS]: The door to the bathroom was broken. The knife is dishwasher clean. [There] was a struggle reported by [Appellant] to have taken place, a fight between him and [Victim], prompted or started by her coming at him with a knife. The evidence indicates she barricaded herself.

[DEFENSE]: That is clear on his interpretation of evidence.

[ADA]: That objection was already overruled.

THE COURT: That objection was already overruled.

[WITNESS]: And any time there is a strangulation there is a struggle.

[ADA]: So in your opinion the photographic evidence that you had an opportunity to review is not consistent with his version of events, is that correct?

- 18 -

[WITNESS]: Yes, he reports that the attack occurred in the pitch darkness. Yes, he knew she had a knife. Her weight, she weighed ninety-three pounds at the time of the autopsy. He was 225 pounds when he entered prison.

[ADA]: Doctor, assume that the defendant I want to talk a little bit about these inconsistencies that you highlighted. What do they say or how did they go into your ultimate conclusions and findings?

[WITNESS]: I don't think there is a dispute about [Appellant] making misrepresentations in connection with various aspects of what was taking place or what he alleges was taking place at the time. There is no dispute about that. The evidence that I mentioned is in conflict with his version of what took place and whether or not, in fact, he believes he was acting in self-defense.

(N.T. Trial, 7/1/21, at 113-16). Based on his review of the evidence, Dr. O'Brien opined that Appellant was able to appreciate the nature, quality, and wrongfulness of his actions during the murder, and this opinion was supported by inconsistencies between Appellant's rendition of the events and what the evidence revealed, which, Dr. O'Brien explained, demonstrated Appellant's tendency to manipulate to his own advantage. (*Id.* at 122-26).

In its opinion, the trial court explained that it found Dr. O'Brien's statements were intended to provide a context to his opinions on Appellant's state of mind and psychiatric diagnosis. On this record, we agree with the trial court. Dr O'Brien testified as an expert in forensic psychiatry. After reviewing the record, he rendered an opinion concerning Appellant's mental health at the time of the murder. As he explained at trial, this opinion was informed by his review of the Pennsylvania State Police case file, which

included photographs of the crime scene. (*Id.* at 99-100). After evaluating this information, Dr. O'Brien conducted an in-person assessment of Appellant. In his report, Dr. O'Brien discussed several inconsistencies in Appellant's version of events, and Dr. O'Brien explained how the inconsistencies informed his opinion as to whether Appellant believed he was acting in self-defense. The court allowed Dr. O'Brien to testify as to how Appellant's version of the events conflicted with record evidence, as those inconsistencies formed the basis of Dr. O'Brien's opinion. We see no reason to disrupt the court's evidentiary rulings. *See Watson, supra*. The record demonstrates that Dr. O'Brien was not testifying as to Appellant's credibility, but he was explaining the basis for his expert conclusion regarding Appellant's mental condition on the day of the murders. As an expert is required to explain the basis for his expert opinion, we discern no abuse of discretion by the trial court. *See id.* *See also* Pa.R.E. 705; *Commonwealth v. Harriston*, 665 Pa. 711, 249 A.3d 1046 (2021), *cert. denied*, ___ U.S. ___, 142 S.Ct. 598, 211 L.Ed.2d 371 (2021) (explaining that admission of expert testimony was proper where purpose of Dr. Wright's testimony was not to bolster witness's credibility but to explain his reasons for reaching his conclusions; Dr. Wright's statement about defendant's veracity was made in context of explain to jury his expert conclusion that defendant's mental condition on day of murders was result of antisocial personality disorder, and not psychosis and depression that defense forensic physiatry expert had proffered). Appellant's third issue is meritless.

In his fourth issue, Appellant argues that the trial court erred when it overruled his objection and permitted the prosecutor to state during closing arguments that Ms. Stidoms was afraid of Appellant. Appellant insists that the prosecutor's statement violated the court's pretrial ruling precluding introduction of the fact that Ms. Stidoms left her house in fear of Appellant. Appellant claims that the purpose of the prosecutor's argument—that because Ms. Stidoms did not leave in fear of Victim, she must have left in fear of Appellant—was to lead the jury to believe that Ms. Stidoms left her house in fear of Appellant. Appellant maintains that the prosecutor's purpose in doing so was to spark emotion in the jury, rather than help the jury reflectively consider whether Appellant or Victim was the aggressor. Appellant concludes the court erred by overruling his objection, and this Court must grant relief. We disagree.

> Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one. Not every inappropriate remark by a prosecutor constitutes reversible error. A prosecutor's statements to a jury do not occur in a vacuum, and we must view them in context. Even if the prosecutor's arguments are improper, they generally will not form the basis for a new trial unless the comments unavoidably prejudiced the jury and prevented a true verdict.

*Commonwealth v. Hernandez*, 230 A.3d 480, 490 (Pa.Super. 2020) (quoting *Commonwealth v. Bedford*, 50 A.3d 707, 715-16 (Pa.Super. 2012)). "Like the defense, the prosecution is accorded reasonable latitude

and may employ oratorical flair in arguing its version of the case to the jury."

*Commonwealth v. Scott*, 212 A.3d 1094, 1110 (Pa.Super. 2019), *appeal denied*, 656 Pa. 486, 222 A.3d 383 (2019). Furthermore, the prosecution "may advance argument supported by the evidence or use inferences that can reasonably be derived therefrom." *Commonwealth v. Jaynes*, 135 A.3d 606, 615 (Pa.Super. 2016), *appeal denied*, 636 Pa. 672, 145 A.3d 724 (2016).

Instantly, during closing arguments, the prosecutor stated the following:

> I asked [Ms. Stidoms], did you leave the house on Christmas day because you were afraid of [Victim]? What did she say, No. There is only one other person who was in that house, only one other person who made [Ms. Stidoms] leave her house.

(N.T. Trial, 7/1/21, at 189). At the completion of the Commonwealth's closing remarks, defense counsel objected "to counsel's statement that Stacey Stidoms was afraid of [Appellant]." (*Id.* at 201). The court overruled the objection.

In its opinion, the trial court explained its ruling as follows:

> We first note that there was a ruling in place prior to [Ms.] Stidoms testifying that she was prohibited from stating that she was afraid of [A]ppellant. As a result, there is no testimony that she was afraid of Appellant. However, that does not prevent the Commonwealth from "advanc[ing] arguments supported by the evidence or us[ing] inferences that can reasonably be derived therefrom." *Jaynes, supra* at 615. There was ample testimony from [Ms.] Stidoms of how acrimonious the relationship between Appellant and the victim was. We find it reasonable for the Commonwealth to suggest the inference that [Ms.] Stidoms left her house because of Appellant. However, it is also reasonable to find

> that the jury inferred that she left the house to avoid hearing the constant bickering and cussing between the victim and Appellant. This inference would have nothing to do with Ms. Stidoms being afraid of Appellant.

(Trial Court Opinion at 20) (record citation omitted). Further, the trial court instructed the jury that the attorneys' arguments do not constitute evidence, and that the jury is not bound by their recollection of evidence or inferences. (*See* N.T. Trial, 7/1/21, at 148).

On this record, we cannot say that the court abused its discretion in overruling the prosecutor's challenged remark during closing argument. Notably, the prosecutor did not violate the court's specific pre-trial ruling, which had precluded **Ms. Stidoms** from testifying that she left the house in fear of Appellant. Further, during her testimony, Ms. Stidoms stated that she was not afraid of Victim. The prosecutor's challenged remark was therefore a fair inference reasonably derived from the admissible evidence that Ms. Stidoms was not afraid of Victim. *See Jaynes, supra*. Therefore, Appellant's final issue merits no relief. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/14/2024

- 23 -